[Civ. No. 13993. First Dist., Div. Two. Sept. 29, 1949.]

PARAMOUNT PICTURES, INC. et al., Respondents, v. MAURICE C. SPARLING, as State Superintendent of Banks, etc., Defendant and Appellant; TOM C. CLARK, as United States Attorney General, etc., Intervener and Appellant.

Tom C. Clark, United States Attorney General, in pro. per., David L. Bazelon, Assistant United States Attorney General, Frank J. Hennessy, United States Attorney, James L. Morrison and J. Roger Wollenberg, Attorneys for Department of Justice, for Intervener and Appellant.

S. M. Saroyan and Shirley, Saroyan, Shearer & Sullivan for Defendant and Appellant.

O'Melveny & Myers, Louis W. Myers, John Whyte, Loeb & Loeb and Walter S. Hilborn for Respondents.

DOOLING, J.—Four actions for declaratory relief were consolidated for trial and from the four declaratory judgments which followed appeals are prosecuted by the Attorney General of the United States, plaintiff in intervention in each action (hereinafter called intervener), and the Superintendent of Banks of the State of California, defendant. The four actions present common questions of law on facts in all material respects similar and it will suffice to state the facts in the action in which Paramount Pictures, Inc. (hereinafter called Paramount), is plaintiff and respondent.

Arising out of the exhibition of motion pictures in Japan Paramount had earnings which by agreement with the Japanese government were not to be paid to it until three years after remittance to Yokohama Specie Bank, Ltd. (hereinafter called the bank), in San Francisco. Pursuant to this agreement there was due from the bank to Paramount $45,078.99 on December 7, 1941, and $58,576.32 on January 31, 1942.

On July 26, 1941, by Executive Order 8389 (40 Stats. 415, 12 U.S.C.A. § 95a, note) the Secretary of the Treasury of the United States amended freezing control regulations to add thereto Japan, the order requiring Japanese enterprises in the United States to obtain licenses from the secretary for continuation of operations. The bank was owned by Japanese nationals and so came within the scope of the order. On the same day the bank obtained the required license to continue business in the United States. After the attack on Pearl Harbor by the armed forces of Japan this license was revoked on December 7, 1941, the bank was ordered closed by the Treasury Department and the four resident officers of the bank, all Japanese nationals, were immediately interned. Representatives of the United States Treasury Department at the same time took possession of the bank's San Francisco branch.

On December 8, 1941 the Superintendent of Banks of the State of California purported to assume control of the bank pursuant to state law, on December 27, 1941 the United States Treasury Department licensed the State Superintendent of Banks to liquidate the bank and on March 19, 1942 licensed him as conservator. On April 20, 1943 the Alien Property Custodian issued a vesting order vesting in himself ''The excess proceeds . . . of the business and property of the (Bank) . . . after payment of the claims of . . . creditors . . . together with interest on such claims. . . .'' The intervener, Attorney General, has succeeded to the rights of the Alien Property Custodian.

The several plaintiffs filed their actions for declaratory judgments seeking an adjudication that they were entitled to interest on their several claims from the date that each fell due and the judgments appealed from so declared.

On appeal the intervener urges 1. that timely payment of the plaintiffs' claims by the bank was excused under sections 5(b) (2) and 7(e) of the Trading with the Enemy Act [40 Stats. 411 et seq., 50 U.S.C.A. App. § 1 et seq.]; and 2. that such payment was prevented by impossibility arising from the operation of law. The United States Circuit Court of Appeals for the Ninth Circuit had previously overruled similar contentions urged by the United States Attorney General in a case in which interest was allowed to the plaintiffs against a Honolulu bank owned by Japanese nationals in *Kiyoichi Fujikawa* v. *Sunrise Soda Water Works Co.*, 158 F.2d 490, certiorari denied 331 U.S. 832 [67 S.Ct. 1511, 91 L.Ed. 1846], rehearings denied 332 U.S. 785 [68 S.Ct. 31, 92 L.Ed. 368]

and 332 U.S. 853 [68 S.Ct. 352, 92 L.Ed. 422]. In that case dealing with similar arguments the court said (and we quote extensively from the opinion because it is apparently the only decision on the subject dealing specifically with a Japanese-owned bank as distinguished from other Japanese-owned businesses) :

"We agree with the district court that appellants have not sustained their burden of proof of such impossibility of performance. There was an obligation of the officers of the bank to the depositors to attempt to obtain from the Secretary of the Treasury a license for a limited operation of the bank which would permit the deposit and withdrawal of moneys, as such action was permitted to the two finance companies and the insurance company which applied for and procured such licenses. The rule regarding impossibility of performance as an excuse for not discharging such an obligation is well stated in the case of *Richards & Co.* v. *Wreschner,* 174 App. Div. 484, 156 N.Y.S. 1054. The court in that case involving a defendant's failure to provide antimony because of adverse war conditions held, quoting from *Cameron Realty Co.* v. *Albany,* 207 N.Y. 377, 101 N.E. 162, 49 L.R.A.N.S. 922.

" 'It is a well-settled rule of law that a party must fulfill his contractual obligations. Fraud or mutual mistake, or the fraud of one party and the mistake of the other, or an inadvertence induced by the one party and not negligence on the part of the other, may relieve from an expressed agreement, and an act of God or the law or the interfering or preventive act of the other party may free one from the performance of it; but if what is agreed to be done is possible and lawful the obligation or performance must be met. *Difficulty or improbability of accomplishing the stipulated undertaking will not avail the obligor. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse nonperformance. The courts will not consider the hardship or the expense or the loss to the one party or the meagerness or the uselessness of the result to the other.* They will neither make nor modify contracts nor dispense with their performance. When a party by his own contract creates a duty or charge upon himself, he is bound to a possible performance of it, because he promised it, and did not shield himself by proper conditions or qualifications.' (174 App.Div. 484, 156 N.Y.S. 1056.) (Emphasis supplied.)

"The rule applies as well to any obligation, the performance

of which is sought to be excused. *Dezsofi* v. *Jacoby,* 178 Misc. 851, 36 N.Y.S.2d 672; *Brown* v. *J. P. Morgan & Co., Inc.,* 177 Misc. 626, 31 N.Y.S.2d 323.

"Executive Order 8389 as material with relation to the question herein provides as follows:

" 'Section 1. All of the following transactions are prohibited, *except as specifically authorized . . . by means of regulations, rulings, instructions, licenses, or otherwise. . . .*' (Emphasis supplied.)

" 'Section 7. . . . the Secretary of the Treasury . . . is authorized and empowered to prescribe from time to time regulations, rulings, and instructions to carry out the purposes of this Order and to provide therein or otherwise the conditions under which licenses may be granted by or through such officers or agencies as the Secretary of the Treasury may designate, and the decision of the Secretary with respect to the granting, denial or other disposition of an application or license shall be final.'

"Appellants ask us to take judicial notice of a confidential circular of December 9, 1941, written by the Secretary of the Treasury to guide his subordinates, stating that *such subordinates* should not license any Japanese bank. Congress has limited executive orders so affecting banks and other nonofficial persons of which we may take judicial notice to those published in the Federal Register. [49 Stats 502] 44 U.S.C.A. sec. 307. The circular was not introduced in evidence in the trial below nor is it shown that it was not there available to the Treasury Department receiver. To seek its probative value on appeal merits the comment of the Second Circuit in *Nagle* v. *United States,* 2 Cir., 145 F. 302, 306.

"However, assuming this appeal to be a trial de novo, we do not see that such instruction to his subordinates in any way relieves the bank officials from seeking a license from the Secretary *himself.* There is no more reason to assume a refusal to consider the situation of a particular bank, closed in the intense excitement of December 9, 1941, than of any other regulated enterprise. The Secretary provided a form of application to himself, as distinguished from his subordinates, for this very purpose. The form opens with the words 'To the Secretary of the Treasury, Washington, D.C.' It was upon application on this form that the licenses were granted to the two finance companies and the insurance company, each classified by the Secretary with the Pacific Bank as a 'banking institution' in Executive Order 8389.

"To approve of the officials' failure to apply for a license and then to hold the continued retention of the depositors' moneys as justified because of an impossibility to do otherwise would enable them to say to the stockholders, 'As your agents we have refrained from doing anything to enable the depositors to regain their funds and hence have made certain the saving of your surplus for any interest claims against it—and this although the surplus came in part from the use of the depositors' moneys on which the borrowers paid interest.'

"Failure of the bank's officials in the discharge of such an obligation to the depositors shows an absence of 'good faith' of Section 5(b) (2) of the Trading With the Enemy Act, as amended by Sec. 301 of the First War Powers Act, 1941, 55 Stat. 838, 50 U.S.C.A. Appendix, sec. 5(b) (2), providing that 'No person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder.'

"We agree with the Supreme Court of Michigan that 'Good faith includes, not only personal upright mental attitude and clear conscience, but also intention to observe legal duties.' *Bliss Petroleum Co.* v. *McNally*, 254 Mich. 569, 237 N.W. 53, 55."

Faced with this adjudication the intervener in the cases before us produced an immigration officer who testified that the officers of the bank in San Francisco were immediately on December 7, 1941 taken into custody and interned. However on cross-examination this witness stated that these officers would have been permitted to consult with an attorney if they had desired, that they would have been permitted to make application to the Secretary of the Treasury for a license to pay the creditors of the bank and that they would have been permitted to go out with an armed guard if the authorities "felt there was a good reason." The trial court found that there was nothing to prevent these officers from applying for a special license to pay the creditors of the bank or these plaintiffs and as a conclusion of law that their failure to do so showed an absence of "good faith" of section 5(b) (2) of the Trading With the Enemy Act.

We are asked to hold that this finding and conclusion are not supported by the evidence, it being pointed out that in the Fujikawa case above quoted from there was no showing that

the officers of the bank were interned. The inferences and conclusions from the evidence are for the trial court to draw and in view of the evidence produced on cross-examination establishing the power of the officers of the bank after internment to make application for a license we cannot hold that the finding and conclusion of the trial court on this subject are not supported by the evidence.

On the subject of impossibility of performance by operation of law the intervener produced the following evidence not before the court in the Fujikawa case, in addition to the confidential circular of December 9, 1941, therein referred to (this testimony was given by a witness who at that time was "chief of one of the three main operating divisions of Foreign Funds Control . . . called the Domestic Division"):

Prior to the Japanese attack on Pearl Harbor since the operation of enemy banks in United States territory would, in the event of war, be a threat to this country's security the Treasury Department had reached a policy decision, in which the secretary participated, to close all enemy banks in the United States and bring about their liquidation in the event that the United States became involved in hostilities. This policy was put into active operation with the outbreak of war. The Treasury Department's policy decision included a determination to close enemy banks, keep them closed, liquidate them, and permit no payments to any class of creditors except pursuant to liquidation. Under the procedure set up by the Treasury Department after December 7, 1941, any application for a license by a Japanese bank would go to the Federal Reserve Bank of the district and by it be automatically denied under specific instructions not to license the operation of any Japanese bank. If an appeal was taken to the secretary from this denial it would have been referred to Foreign Funds Control and there denied pursuant to the established policy. Even if an application for a license had been mailed directly to the Secretary of the Treasury it would have been transferred from his mail room to the Foreign Funds Control mail room and from there either sent to the proper Federal Reserve Bank or to the applicant with instructions to file it with such Federal Reserve Bank. A general license issued by the secretary personally after December 7, 1941, contained the following provision: "This general license shall not be deemed to license as a generally licensed national any bank . . .." On December 20, 1941, all licenses revoked on December 7, 1941,

were, with the exception of banks and other designated classes of business, reinstated without application.

On cross-examination the witness stated that he knew of instances where "attorneys representing applicants for licenses have got in to see the Secretary of the Treasury" and that in case of a denial of an application for a license and of an appeal therefrom an applicant would be "entitled to attempt to seek" the granting of such an application by the secretary himself. The record is silent as to whether the secretary was ever called upon to act personally upon any application for a license to an enemy-owned bank.

The trial court found against the defense of impossibility by operation of law. The intervener insists that this finding is not supported by any evidence.

The burden of the defense was on the intervener. That it was a heavy burden is shown by the language which the Circuit Court of Appeals quoted and italicized from *Cameron Realty Co.* v. *Albany,* 207 N.Y. 377 [101 N.E. 162, 49 L.R.A. N.S. 922], in the Fijikawa case, 158 F.2d at page 493 :

"Difficulty or improbability of accomplishing the stipulated undertaking will not avail the obligor. It must be shown that the thing cannot by any means be effected. Nothing short of this will excuse performance."

Substantially the same language was quoted by our own Supreme Court from The Harriman, 9 Wall. 172 in *Klauber* v. *San Diego St. Car Co.,* 95 Cal. 353, 358 [30 P. 555].

In *Dezsofi* v. *Jacoby,* 177 Misc. 851 [36 N.Y.S. 672 at p. 674] (a case cited with approval in the Fujikawa case, 158 F.2d at p. 493) the court said :

"It is not enough, therefore, to merely assert impossibility of performance by reason of the executive order, but there should be an allegation of a bona fide attempt by defendant (to procure a license) and that such attempt failed." (See, also, *Brown* v. *J. P. Morgan & Co.,* 177 Misc. 626 [31 N.Y.S.2d 323, 333-334] ; *Meijer* v. *General Cigar Co.,* 73 N.Y.S.2d 576, 585 ; id. 81 N.Y.S.2d 488, 490.)

The intervener says in his brief: "The uncontradicted testimony of a Treasury official who participated in the policy decisions indicates the extreme improbability of any change in the fixed policy of permitting liquidation only." The cases hold that improbability is not enough. The final policy determination lay with the Secretary of the Treasury. Policy decisions can be changed or relaxed or exceptions

allowed in special instances. The real difficulty that lies in the way of the intervener's contention that impossibility was proved as a matter of law is that the question whether or not the Secretary of the Treasury would or might have relaxed the policy to permit a solvent enemy bank to pay American creditors was never put to the only realistic test of an actual application for a license pressed to his personal attention. We are asked to conclusively presume in the absence of evidence that any such application was ever brought to his personal attention by any enemy-owned bank that under no circumstances would the secretary have issued a license to such a bank to pay its American creditors. The trial court concluded that the burden of proof of impossibility was not sustained. The inference from the evidence if reasonable was its to draw. It needs no citation of authority that even if we, as triers of the fact, would have reached an opposite conclusion we cannot set our judgment against that of the trial judge so long as his conclusion is a tenable one.

The intervener also asserts that once the bank was turned over to the State Bank Superintendent for liquidation impossibility of immediate payment became absolute. As we read the record the State Superintendent was acting under authority of the Secretary of the Treasury and nothing appears to show that his authority was exhausted by the first licensing order or that the secretary might not at any time have modified it.

The Superintendent of Banks asserts his purported taking over of the bank under state law. As against the federal government in time of war the paramount power of the Secretary of the Treasury seems to us not open to question and the superintendent seems to have acquiesced in this view by accepting and acting under license from the Treasury Department.

The judgments are declaratory only. Hence matters occurring subsequent to the trial, and not in the record, which the superintendent asks us to consider, if they may have stayed the running of interest for a period are still open if the respondents seek recovery of more than the superintendent believes them entitled to pursuant to their declaratory judgments. There is no reason for us to consider these matters on this appeal.

The judgments provide that the several plaintiffs are entitled to interest on the several amounts from the date when each fell due ''to the extent that said assets are available for this

purpose.'' If all creditors cannot be paid in full with interest to those entitled thereto the judgments will permit a ratable distribution of interest.

Judgments affirmed.

Nourse, P. J., and Goodell, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied November 21, 1949.