[L. A. No. 23085. In Bank. Dec. 23, 1955.]

JOHN OOSTEN, Respondent, v. HAY HAULERS DAIRY EMPLOYEES AND HELPERS UNION, etc., et al., Defendants; KNUDSEN CREAMERY COMPANY OF CALIFORNIA, Appellant.

Vaughan, Brandlin & Wehrle, Vaughan & Brandlin, J. R. Vaughan and Richard I. Roemer for Appellant.

Russell E. Parsons and John Van Aalst for Respondent.

Bronson, Bronson & McKinnon, A. F. Mather, Charles A. Rummel, Joseph Wahrhaftig and John H. Painter as Amici Curiae on behalf of Respondent.

CARTER, J.—Plaintiff, a dairy farmer, producer and seller of milk, recovered damages in the sum of $20,314.19 against defendant, Knudsen Creamery Company (hereinafter referred to as defendant), engaged in the business of processing and selling milk, for breach of contract, in an action against defendant and several unions and their officers. Judgment was for the unions denying plaintiff damages or an injunction against them. Defendant appeals; plaintiff has not appealed.

Plaintiff entered into a contract to supply milk to defendant Knudsen Creamery Company, and this contract was in effect between August 6, 1951, and March 15, 1952. Under this contract defendant agreed to purchase milk produced by plaintiff during this period. Clause 12 of the contract provided: "In case of strike, lockout, or other labor trouble (whether the parties hereto are directly or indirectly involved) . . . which shall render it *impossible* for Seller to deliver, or buyer to handle or dispose of such milk, no liability for noncompliance with this agreement caused thereby during the time of continuance thereof shall exist or arise with respect to either party hereto." (Emphasis added.)

According to the findings of the trial court, between August 6, 1951, and March 15, 1952, defendants Hay Haulers, Dairy Employees and Helpers Union, Local Union Number 737, associated with A. F. of L., and Plant and Clerical Dairy Employees, Local 93, were labor unions, and that Dairy Employees Union Local 17, associated with the Christian Labor Association, not a party, was also a union; that some time prior to August 6, 1951, defendant unions were having a labor dispute with plaintiff and declared a boycott against and picketed plaintiff's place of business; that the picketing activity was stopped by a restraining order issued by the court; that defendant breached the contract in refusing to take plaintiff's milk from August 6, 1951, to March 15, 1952, when plaintiff sold his dairy herd; and that as a result, plaintiff suffered the damage above mentioned. Defendant's only reason for refusing to accept the milk was a claimed impossibility of per-

formance under clause 12 of the contract, *supra*. The court found that defendant did not "prove by a preponderance of the evidence that it was impossible for it to handle or dispose" of plaintiff's milk within the meaning and "proper interpretation" of clause 12.

Defendant contends that the evidence all shows that it was excused from accepting the milk under clause 12 because of the refusal of its employees to handle it due to the labor dispute between plaintiff and Local 737; that plaintiff's failure to dispose of his milk at the prevailing market prices was caused by his dispute with the unions rather than a breach by defendant of the contract.

The evidence shows that in July, 1951, plaintiff had nine employees. He was then asked by the defendant unions to sign a collective bargaining agreement by which they would represent his employees. He refused to sign, asserting that his employees did not want to join the unions. He was advised by the unions that unless he signed, his place of business would be picketed. On July 27, 1951, he signed a collective bargaining agreement with Local 17 and in that connection the court found he took a leading part in inducing his employees to join that union. Picketing of plaintiff's place of business by defendant unions was commenced on August 6, 1951. A defendant union representative told defendant's employees, but not defendant, that a dispute existed with plaintiff and they did not have to handle plaintiff's milk. Plaintiff hauled his milk to defendant's receiving point. Nygaard, defendant's foreman of unloading operations, refused to take the milk and called two of defendant's supervisory employees, and the foreman's request of the unloading employee, Lorge, that he unload the milk was refused on the grounds that it was "unfair" milk, because of the dispute between plaintiff and defendant unions.* Plaintiff disposed of his milk elsewhere. Plaintiff commenced the instant action, and having obtained a restraining order against defendant unions, the picketing stopped. Several other attempts were made by plaintiff to deliver milk to defendant including the following: In September, 1951, he attempted to deliver his milk to defendant the same as before. Defendant's supervisory employees were present and the employee in charge of the unloading operation was given a copy of the restraining order but said he would not handle the milk and defendant's foreman said they could do nothing

*The unloading was done by defendant's employee pumping it from plaintiff's truck and could be done by one man.

about it. About two weeks later a similar attempt under similar circumstances was made with similar results, with the addition that a new restraining order had been obtained which ordered defendant's employees to handle plaintiff's milk. Plaintiff testified that none of defendant's supervisory employees who were present, except foreman Nygaard, ordered Lorge or anyone else to unload the milk when plaintiff attempted to make the various deliveries; however, there is evidence that one of such supervisory employees gave such order. After Lorge had refused to unload the milk, defendant's supervisory employees said there was nothing they could do about it. On August 28, 1951, plaintiff wrote to defendant regarding its refusal to accept the milk, stating that he had obtained an injunction against the picketing and demanded that defendant comply with the contract.

There is evidence that Local 93 with whom defendant had a collective bargaining agreement covering its employees advised defendant that plaintiff's milk was "hot" and the employees under the bargaining agreement did not have to handle it and could not be fired for refusing to do so; that the restraining order obtained by plaintiff did not change the situation; that an exempt employee of defendant, a supervisory employee, could not unload the milk. In a similar case a year before, Local 93 had informed defendant that if any of its employees were fired or discharged for refusing to handle "hot" milk, the plant would be shut down. Defendant called a large number of its employees as witnesses, and they testified that they would have refused and would still refuse to handle plaintiff's milk under the circumstances, and it was stipulated that the rest of its employees would testify to the same effect.

■ Impossibility of performance is a defense and the burden of proof in establishing it rests on defendant. (*Hensler* v. *City of Los Angeles*, 124 Cal.App.2d 71, 83 [268 P.2d 12]; *Paramount Pictures, Inc.* v. *Sparling*, 93 Cal.App.2d 768 [209 P.2d 968]; *McCulloch* v. *Liguori*, 88 Cal.App.2d 366 [199 P.2d 25]; *Lloyd* v. *Murphy*, 25 Cal.2d 48 [153 P.2d 47].)

■ " 'Impossibility' is defined in section 454 of the Restatement of Contracts, as not only strict impossibility but as impracticability because of extreme and unreasonable difficulty, expense, injury, or loss involved. ■ Temporary impossibility of the character which, if it should become permanent, would discharge a promisor's entire contractual duty, operates as a permanent discharge if performance after the impossibility ceases would impose a substantially greater burden upon the promisor; otherwise the duty is suspended while the impossi-

bility exists. (Restatement of Contracts, § 462.)'' (*Autry* v. *Republic Productions, Inc.*, 30 Cal.2d 144, 148 [180 P.2d 888] ; *Lloyd* v. *Murphy, supra,* 25 Cal.2d 48.) In the instant case we construe clause 12, with respect to impossibility of performance, the same as it is construed generally in contract law with regard to whether the performance has been made impossible. The only things the clause adds are that certain things—labor dispute, strikes—may excuse performance, when without it they might not, but the question remains whether those things have made performance impossible. ▋ As has been said: ''We can not always be sure what 'causes are beyond the control' of the contractor. Many fires can be prevented by the use of foresight and sufficient expenditure. Most strikes can be avoided by a judicious yielding or by an abject surrender to demands. No contractor is excused under such an express provision unless he shows affirmatively that his failure to perform was proximately caused by a contingency within its terms ; that, in spite of skill, diligence and good faith on his part, performance became impossible or unreasonably expensive.'' (Corbin on Contracts, § 1342.)

▋ On the record before us the trial court was justified in concluding, as it did, that defendant was not prevented by impossibility from performing the contract. There was no evidence that the union would call a strike if the milk was received by defendant, except the inference that might be drawn from its claim in a similar situation a year before that it would shut down defendant's plant if defendant handled hot milk. The trial court was not compelled to draw that inference. The court could have given little weight to the effect on defendant's employees of the statement by the officials and attorney of Local 93 that they, as individuals, were not required to handle hot milk or that the telling of defendant that they would not consider it a breach of the collective bargaining agreement between defendant and Local 93 for the employees to refuse to handle the milk. Defendant at no time told its employees that if they refused to handle plaintiff's milk they would be discharged. In the bargaining agreement between defendant and Local 93 the latter agreed that there shall be no strike during the life of the agreement and if any controversy arose it would be settled by the negotiation procedure in the agreement, and ultimately by arbitration, if the other means failed. The court could infer that Local 93 would abide by the agreement. No steps were taken to settle any controversy under the agreement. The weight of the testimony of

defendant's employees that they would not have handled plaintiff's milk was for the trial court. Many of them knew little about the dispute as to plaintiff's milk or what defendant had been doing about hot milk or the attitude of Local 93. At most their testimony was as to what they *would do*, a matter only of their mental attitude, and whether they would actually refuse when confronted with the possibility of discipline was another matter. The trial court was justified in its finding that defendant had not proven impossibility; indeed, it may have concluded that defendant showed nothing more than a vague threat of adverse action by Local 93 and the employees (see *Moore* v. *Whitty*, 299 Pa. 58 [149 A. 93, 94]), and that defendant was under no pressure other than its desire not to antagonize Local 93.

Plaintiff's counsel remarked in his opening statement that defendant's plant would "probably be tied up" if it took plaintiff's milk but we do not consider that as conclusive. The trial court could still determine the case on the evidence. There is evidence that defendant's employees would obey the officials of Local 93, but as we have seen, it does not appear that Local 93 would necessarily have called a strike. The collective bargaining agreement between defendant and Local 93 provided that defendant could not "discriminate against" its employee members of Local 93 for "upholding the *principles* of the American Federation of Labor" (emphasis added) but there still was the arbitration provision and the court was not required to find that those "*principles*" included a boycott. Nor is the situation different because the court approved the action of defendant's employees in refusing to handle the milk by denying an injunction or the loss that might have been suffered by defendant if its plant was shut down because, as seen, defendant did not establish to the satisfaction of the trial court that such loss was imminent.

▮ Contrary to defendant's contention we do not find any prejudging by the trial court of defendant's many employees who testified that they would not have handled the milk. He merely remarked that it would take an employee of courage to testify otherwise in the presence of agents of Local 93 and that "as far as the weight of the evidence goes I think it is not as strong as it might be."

It is not decisive whether a strike or a refusal of Local 93 to instruct its members to handle the milk or a refusal by defendant's employees to unload the milk would be legal or illegal action for, as seen, the matter here turns on whether defendant has sustained its burden of showing impossibility,

the existence of which would excuse it from performance where caused by a strike or labor trouble.

Complaint is made that the damages were caused, not by defendant's refusal to take the milk but rather by the fact that the milk was "hot" because of plaintiff's dispute with Local 737 which prevented him from selling it elsewhere at the current market price; that plaintiff brought on the labor dispute with Local 737 by signing with Local 17 and discharging an A. F. of L. employee working for him; that the evidence shows there was a market price established under state law for Class I milk, the kind plaintiff produced, and the contract between them provided for such market price.

If that argument means that the cause of the contract breach by defendant was the labor dispute in which plaintiff was involved it is nothing more than another argument on the issue of impossibility heretofore discussed. ▮ Defendant breached the contract, but plaintiff, in spite of the labor dispute with Local 737, delivered the milk and endeavored to have defendant accept it. Thus the damages, whatever they may be, were caused by defendant's refusal to accept the milk rather than plaintiff's labor dispute. Defendant's breach not being excused, as found by the trial court, it follows that plaintiff is entitled to any damages he suffered by reason of defendant's refusal to buy the milk. The question then arises as to the proper measure of damages. Is the difference between the current market price of Class I milk and the price fixed in the contract the proper measure here? Section 1784 provides: "(1) Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance.

"(2) . . . The measure of damages is the estimated loss directly and naturally resulting in the ordinary course of events, from the buyer's breach of contract.

"(3) Where there is an *available market* for the goods in question, the measure of damages is, in the absence of special circumstances, showing *proximate* damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept.

"(4) (*Mitigation.*) If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the

seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand. The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages." (Emphasis added; Civ. Code, § 1784.) ▮ Because plaintiff had his herd of cows and they inevitably produced milk daily, the milk was certain to be produced and he should not be required to get rid of his herd to stop production; therefore, subdivision 4 of section 1784 can have no application. (See *O'Hare* v. *Peacock Dairies, Inc.*, 26 Cal.App.2d 345 [79 P.2d 433].)

▮ Defendant urges that subdivision 3 is applicable and as there were not special circumstances showing *proximate* damage of a greater amount, the difference between the contract price and the market price is the measure; that the contract price and current market price were the same and plaintiff's labor dispute, which made the milk hot rather than defendant's refusal to accept it, was the proximate cause of any additional damages suffered by him; that hence plaintiff was entitled to no more than nominal damages. The court found that "the only creamery company within practicable delivery distance of plaintiff's dairy, which would accept plaintiff's milk during the period extending from August 6, 1951, to March 15, 1952, was the Excelsior Creamery Company . . . that said . . . Company, for the [said] period . . . did accept all of plaintiff's milk . . . but said Creamery Company was unable to use all of such milk as Class I milk by reason of pre-existing contracts with other milk producers, but, on the contrary could accept part of said plaintiffs' milk only as Class II or as manufacturing milk, respectively; the Court further finds that the prices paid milk producers by creameries, in accordance with the rules and regulations of the Bureau of Milk Control of the State of California, for Class II milk and for manufacturing milk, respectively, is considerably less in each case than that paid for Class I milk; the Court further finds that the difference between that which the plaintiff received for his milk, for the period extending from August 6, 1951, to March 15, 1952, from Excelsior Creamery Company and that which he would have received from the defendant . . . had said defendant carried out the terms of the above described contract . . . by accepting all of plaintiff's milk . . . as Class I milk, totals $20,314.19." The evidence shows plaintiff sold his milk to the Excelsior Cream-

ery Company at Santa Ana, 20 miles from his dairy (defendant's plant is in Los Angeles, 20 miles from plaintiff's dairy) but Excelsior had no market for Class I milk and paid plaintiff at the rate for a lower class of milk. Plaintiff testified that he tried to sell it elsewhere but could not because it was considered hot milk due to his dispute with Local 737. A witness for defendant testified that during the period for which damages were awarded there was a market in the area for Class I milk. While it may be that one of the causes why plaintiff could not dispose of his milk, except to Excelsior, was the labor dispute, it still is true that he did not have any market for it except to Excelsior. There was no defect in the quality of the milk and defendant had no legal excuse for its refusal to accept the milk. The refusal of defendant and other union milk buyers to take plaintiff's milk resulted, at least in part, because they thought it might have some effect upon their collective bargaining agreements with the union. Thus a proximate result of defendant's refusal to take the milk was plaintiff's inability to find a market. Under all the circumstances the court was justified in concluding that the only market available was Excelsior, the company to which plaintiff sold the milk, and the difference between the price they paid and that specified in the contract was a proper measure of damages.

Amici curiae have filed a brief urging some of the points heretofore discussed and further asserting that the activity of the union defendants was a boycott, illegal under the Labor Management Relations Act (29 U.S.C.A. § 158), and thus easily prevented by defendant by the machinery provided in that act, and that an illegal act by another will not support a finding of impossibility of performance. There is nothing in the case to indicate that the national law is here applicable. Hence there is no occasion to discuss the merits of this contention.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., concurred.

EDMONDS, J.—Paragraph 12 of the contract which governs the rights of Oosten and the dairy provides: "In case of strike, lockout, or other labor trouble (whether the parties hereto are directly or indirectly involved) . . . which shall render it impossible for Seller to deliver, or Buyer to handle or dispose of such milk, no liability for non-compliance

with this agreement caused thereby during the time of con-. tinuance thereof shall exist or arise with respect to either party thereto.'' In resisting the contention that Knudsen's performance was excused by this provision, the majority rely upon the finding that ''the defendant . . . did not prove by a preponderance of the evidence that it was 'impossible' for them to 'handle or dispose of' the milk of the plaintiff . . ..''

Although the burden of proving the facts upon which the defense of impossibility of performance rests lies with the one claiming under the defense (*Hensler* v. *City of Los Angeles*, 124 Cal.App.2d 71, 83 [268 P.2d 12]; *Paramount Pictures, Inc.* v. *Sparling*, 93 Cal.App.2d 768, 775 [209 P.2d 968]), whether the facts show the excuse of impossibility is a conclusion of law to be drawn by the court. (*Mitchell* v. *Ceazan Tires, Ltd.*, 25 Cal.2d 45, 48 [153 P.2d 53].) In the present case, there is no substantial dispute in the evidence as to the circumstances and the conduct of the parties in relation to them.

California follows a more liberal view than the courts of many other jurisdictions in the application of the doctrine of impossibility. It is not enough that performance of the contract is made more difficult or expensive (*McCulloch* v. *Liguori*, 88 Cal.App.2d 366, 372-373 [199 P.2d 25] and cases cited), but performance may be excused under circumstances showing ''not only strict impossibility but . . . impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'' (*Autry* v. *Republic Productions, Inc.*, 30 Cal.2d 144, 148 [180 P.2d 888]; *City of Vernon* v. *City of Los Angeles, ante*, p. 710 [290 P.2d 841]; *Mineral Park Land Co.* v. *Howard*, 172 Cal. 289, 293 [156 P. 458, L.R.A. 1916F 1]; Rest. Contracts, § 462.)

It may be presumed that in adopting paragraph 12 of their contract, the parties had in mind the more liberal rule as to ''impossibility'' established by California law. Furthermore, the parties appear to have so qualified their use of the term by express contemplation of the possibility of ''strike, lockout, or other labor trouble (whether the parties hereto are directly or indirectly involved),'' contingencies which ordinarily do not render performance impossible under strict definitions of the term. Such a provision, even under the strict view of impossibility followed by many courts, probably would suffice as a ''proper condition'' or ''qualification'' whereby a party might ''shield'' himself from impractica-

bility of performance arising from labor difficulties. (*Cf. Kiyoichi Fujikawa* v. *Sunrise Soda Water Works,* 158 F.2d 490, 493.)

Oosten was directly involved in a labor controversy with the union which also represented the workers of Knudsen. Because of that controversy his milk was branded as being "unfair." Unquestionably, the refusal of Knudsen's workers to handle the milk, was based upon the demands of the union representatives. The testimony of the Knudsen men who received and processed the milk establish that they refused to handle it even in face of threats of discharge. In these circumstances, performance of the contract would have been impractical and unreasonably difficult.

The argument is made, however, that Knudsen should have taken further action in an effort to coerce its employees to handle Oosten's products. Knudsen might have discharged its employees who refused to handle the products and then attempted to pursue its legal remedies, if any, against the union, which, it is said, at most made only "a vague threat to call a strike" if the products were handled. (*Cf. Moore* v. *Whitty,* 299 Pa. 58 [149 A. 93, 94].) But the evidence clearly shows that the employees vital to the processing of the milk refused to handle it despite a court order, the direct orders of the employer's representatives to handle the milk and the threat of discharge. To require the employer to discharge its employees, with resulting losses in the handling of the products of other suppliers, would place upon the employer the burden of sustaining additional losses without any likelihood that it could fulfill its obligations under the Oosten contract.

Furthermore, it is unrealistic under present day conditions to construe a clause designed to insulate the parties to a contract from liability for nonperformance arising from "labor trouble" as affording protection only to the party who ultimately establishes the justice of his position in the controversy. Commonly, particularly in matters involving economic pressure against persons not directly involved in the labor dispute, the parties are thrown into the controversy without any certainty of their ultimate legal rights. In such a case, there is even greater reason why such person should wish to shield himself from liability for nonperformance occasioned by a yielding to the pressure.

For these reasons, in my opinion, reasonably construed,

paragraph 12 of the contract excuses performance of it under the circumstances established by the undisputed facts.

The judgment should be reversed.

Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied January 18, 1956. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.