HONG KONG ISLANDS LINE
AMERICA S.A., a Panama
corporation, Plaintiff,

v.

DISTRIBUTION SERVICES LIMITED,
a Hong Kong corporation,
Defendant.

And Related Counterclaims.

No. CV 89–3029 JSL (Gx).

United States District Court,
C.D. California.

July 29, 1991.

Jerry Pickering and Thomas A. Russell, Williams, Woolley, Cogwell, Nakazawa & Russell, Long Beach, Cal., for Hong Kong Islands Line America S.A., plaintiff.

R. Joseph Decker, Decker & Bebereia, Long Beach, Cal., and David P. Street, Galland, Karasch, Morse & Garfinkle, Washington, D.C., for Distribution Services Ltd., defendant.

LETTS, District Judge.

This matter came on for court trial on March 12, 1991 before the Honorable J. Spencer Letts, United States District Judge. The matter having been duly tried, the Court now makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff and counterdefendant Hong Kong Islands Line America S.A. ("HKIL") was at all times relevant to this action a corporation duly organized and existing under and by virtue of the laws of the Republic of Panama, with its principal place of business in Hong Kong, and was qualified to do business in the State of California. HKIL was at all relevant times a vessel-operating ocean common carrier of goods in international commerce.

2. Defendant and counterclaimant Distribution Services Limited ("DSL") was at all times relevant to this action a corporation organized and incorporated under the Companies Ordinance of Hong Kong, with its principal place of business in Hong Kong, and was qualified to do business in the State of California. DSL was at all relevant times a non-vessel-operating common carrier ("NVOCC") doing business within the jurisdiction of this Court. As an NVOCC, DSL was a shipper with respect to vessel-operating common carriers like HKIL, and a carrier with respect to its own customers.

3. On January 9, 1988, HKIL and DSL entered into Service Contract No. 231 (hereinafter "SC 231" or "the contract"). In general, SC 231 covered the transportation of any and all commodities shipped by DSL in containers from certain ports in the Far East to certain ports or points in the United States. (Ex. 1, Clause 3) SC 231 required DSL to ship a minimum volume of three thousand five hundred (3,500) forty-foot (40') equivalent units ("FEUs") of cargo with HKIL during the term of the contract. (Ex. 1, Clause 6) SC 231 included a schedule of various HKIL rates and charges for the transportation of cargo, depending upon the size of the container and the destination. (Ex. 1, Clause 7(AA)) The duration of SC 231 was from January 12, 1988 through January 11, 1989. (Ex. 1, Clause 2) The service commitment of SC 231 required HKIL to provide DSL with containers and space on a regularly-scheduled basis, and to provide a minimum of fifty (50) voyages during the term of the contract. (Ex. 1, Clause 5) The liquidated damages for nonperformance under SC 231 was the lesser of (i) $1,500 per FEU of shortfall under the contract; or (ii) an amount representing the difference between the contract rates and HKIL's tariff rates for the cargo actually shipped under the contract. (Ex. 1, Clause 10) [1]

4. On January 12, 1988, the effective date of SC 231, a copy thereof, and a

---

1. During the negotiations of SC 231, HKIL initially proposed liquidated damages of $1,900 per FEU of shortfall, equivalent to the amount of ocean freight payable for each FEU shipped. DSL countered with $500 per FEU of shortfall. The parties agreed on $1,500 per FEU of shortfall. This represented a reduction of $250 per FEU from the 1987 service contract between HKIL and DSL, which required liquidated damages of $1,750 per FEU of shortfall. In general, the parties intended that liquidated damages under SC 231 would represent the approximate amount of HKIL's anticipated lost profits for a shortfall as measured by the difference between its marginal revenues and marginal costs for the containers not shipped.

statement of its essential terms, were duly filed in tariff format with the Federal Maritime Commission ("FMC"), in accordance with the Shipping Act of 1984. (Ex. 1A)

5. During the term of SC 231, HKIL provided DSL with containers and space on a regularly-scheduled basis. (Ex. 77, 111–164) HKIL offered 32,362.5 FEUs (64,-725.0 TEUs) of space to DSL during the term of SC 231. (Ex. 228). This space was provided on 21 different vessels which made 89 voyages between ports covered by SC 231. (*Id.*) HKIL utilized both time-chartered and space-chartered vessels to transport cargo under SC 231. Space-chartering was permitted under the provisions of SC 231, and under HKIL's Bill of Lading.[2] In addition, DSL voluntarily shipped cargo on space-chartered vessels, and counted the cargo shipped towards its minimum volume commitment. (Ex. 12, 30 and 31) For such voyages, DSL obtained the benefits of HKIL's performance under SC 231, including the SC 231 volume discount rates. (Ex. 115, 117, 118A, 119A, 120, 124, 127, 129, 136)

6. SC 231 required DSL to schedule its shipments by telex. (Ex. 1, Clause 5(A)) Nevertheless, DSL made almost all of its bookings by telephone.

7. In total, DSL shipped cargo on 56 voyages under SC 231 during its one-year term, resulting in a total volume of 2,687 FEUs shipped under the contract, and a shortfall of 813 FEUs under the minimum volume.

8. DSL purported to ship cargo with HKIL under SC 231 on two additional voyages after expiration of the one-year term of the contract. Such shipments did not count under SC 231 because the contract did not permit DSL to make shipments under the contract after it had expired.

9. DSL had the ability to meet the SC 231 minimum volume commitment of 3,500 FEUs. (Ex. 29, 30) During the first four months after entering into SC 231, DSL entered into service contracts with seven other carriers. In those subsequent contracts, DSL made an additional volume commitment of 14,380 FEUs, more than four times the size of DSL's minimum volume commitment under SC 231.[3] DSL met

**2.** SC 231 is expressly subordinated to HKIL's Bill of Lading. Clause 1 of SC 231 states, "The provisions as per the Bill of Lading shall prevail." (Ex. 1, Clause 1.) All HKIL Bills of Lading that were issued for shipments made under SC 231 included the following provisions:

15. TRANSSHIPMENT: SUBSTITUTION OF VESSEL. Whether or not the Goods are consigned to a port or points where the vessel does not discharge, the Carrier may, without notice, transship the whole or any part of the Goods before or after loading at the original port of shipment or any other place or places even though outside the scope of the voyage or the route to or beyond the port of discharge or destination of the Goods *by any substituted or connecting water carrier's vessel* or other means of transportation by water or by land or by air, whether operated by the Carrier or by others.

16. SCHEDULE: DELAY. *The carrier does not undertake that the Goods will be transported* from or loaded at the place of receiving or loading or will arrive at the place of discharge, destination or transshipment *aboard any particular vessel* or other conveyances of any particular date or time or to meet any particular market or in time for any particular use. Scheduled or advertised departures and arrival times are only expected times and may be advanced or delayed if the carrier or any Joint Service Connecting Carrier shall

find it necessary, prudent or convenient. In no event shall the carrier be liable for consequential or other damages for delay in the scheduled departures or arrivals of the vessel or other conveyances transporting the Goods. (emphasis added) (Ex. 227)

**3.** DSL made the following additional minimum volume commitments with other carriers during the term of SC 231:

A. 3,000 FEUs to Evergreen Marine Corporation on 3/10/88, a one-year contract. (Ex. 100)

B. 180 FEUs to Korea Shipping Corporation on 2/24/88, a six-month contract. (Ex. 101)

C. 300 FEUs to America Transportation Lines, Inc. on 3/15/88, a one-year contract. (Ex. 102)

D. 5,000 FEUs to Hanjin Container Lines, Ltd. on 4/1/88, a one-year contract. (Ex. 103)

E. 5,000 FEUs to Asia North American Eastbound Rate Agreement on 3/2/88, a one-year contract. (Ex. 107)

F. 150 FEUs to EAC Lines Transpacific Service, Inc. on 3/1/88, a one-year contract. (Ex. 225)

G. 750 FEUs to NSCP on 2/20/88, a one-year contract.

or exceeded the ANERA contract by 122 percent, representing 1,108 FEUs over the minimum, which itself exceeded the shortfall of 813 FEUs under SC 231. (Ex. 30) DSL did not advise HKIL of the quantity of these other commitments, or that it intended to distribute its cargo among these other carriers.

10. The commercial intent of SC 231 is apparent, and plainly effected by its terms. SC 231 permits HKIL to accept and transport all of the cargo it can obtain at tariff or other rates higher than those provided in SC 231, so long as it makes available to DSL at least the amount of space on at least the number of voyages stated in SC 231. DSL receives a substantially discounted rate for cargo shipped under SC 231, but in return it is required either to ship a certain minimum quantity at the contract rate, or pay the lesser of the tariff rate or a rate established by a liquidated damage clause.

11. Under the terms of SC 231, therefore, HKIL obtains the assurance of a fixed volume by giving DSL its most favorable price, while DSL obtains the most favorable price by giving up the assurance that it can ship cargo on any particular vessel, at any particular time, so long as over the course of the contract HKIL meets the minimum space and voyage requirements.

12. The *force majeure* clause of SC 231 protects DSL against periods during which, for the reasons stated in the provision, DSL is unable to ship, by reducing the minimum quantity which it is obligated to ship over the life of the contract by one full day ($^1/_{365}$) for each day during which the *force majeure* condition continues.

13. Invocation of the *force majeure* clause excuses the performance of both parties. During the period of *force majeure*, DSL is not obligated to ship, and HKIL is not obligated to make space available or to ship at discount rates.

14. DSL's argument that SC 231 should be construed so as to allow it to invoke the *force majeure* clause, and to continue to ship at the discounted rate provided by SC 231, but without liability under the liquidated damage provision (which becomes operative if HKIL fails to ship the minimum required quantity over the life of the contract) is without merit. Nothing in the language of SC 231 supports such a construction, and indeed it appears to defeat the very purpose of the contract.

15. The court agrees with DSL that the *force majeure* clause is extremely broad, but not that it could be invoked with no price attached. If DSL decided that SC 231 was not profitable, it had the right to stop shipping under it, and to incur no liability as a result, but it had no right to continue shipping and accepting the discounted price established by SC 231 without honoring the contract minimums also established by SC 231.

16. The *force majeure* provisions of SC 231 are set forth in two separate clauses. The first is Clause 10 of SC 231, which states:

### DISABLING CIRCUMSTANCES

Each party is excused from this contract for reasons of force majeure. Force majeure as used herein shall mean and include, without limitation, strikes, accidents, lockouts, fire, marine, disasters, acts of God, or public enemy, embargoes, riots, civil commotion, government request, abandonment of service, loss or partial loss of market, inability to obtain material, power, equipment, transportation or any other causes affecting the market into which [DSL] will sell its services, including contingencies (i.e., changing markets, business declines, government intervention, etc.) which make [it] impossible or unprofitable for [DSL] to sell its services in the market. The party invoking force majeure shall notify the other party within five (5) days thereof including in the notice of advice, the pertinent facts and should promptly notify the other party when such force majeure has terminated. All such notification[s] must be in writing. (Ex. 1, Clause 10)

The second *force majeure* provision of SC 231 is Clause 11(AA), which states:

*ADJUSTMENT OF MINIMUM VOLUME*

In case of force majeure, the period or periods, during which shipments cannot be made, shall be considered disability periods and the minimum volume will be adjusted to $\frac{1}{365}$ per day of the actual effectiveness of the agreement rounded upwards to the next full container, i.e., no reduction in quantity will be permitted for Saturdays, Sundays, or legal holiday[s]. (Ex. 1, Clause 11(AA))

17. Clauses 10 and 11(AA) required DSL to give actual notice to HKIL within five days after the commencement of any *force majeure* event. Notification of *force majeure* was required to be given prospectively, rather than retroactively. Each party's duties under the contract were suspended during the time that any *force majeure* was taking place.

18. On or about May 25, 1988, DSL mailed a letter to HKIL stating:

We hereby inform you that we are invoking the Force Majeure Clause of our contract No. 21.

We are suffering tremendous reductions in our Korean cargo liftings due to ongoing strikes, riots and civil commotions which started in Mid. April, 1988.

We have not addressed this problem to you previously as we were continually told the strikes and riots would soon be over and work in factories and plants would soon return to normal. However, the strikes and riots continue on and its (sic) now to the point that these protracted labor disturbances have cause numerous cancellations of shipments thereby severely effecting (sic) our cargo liftings from Korea. (Ex. 6)

19. This notice did not specify that DSL considered that the strikes and riots were "contingencies" ... which made it unprofitable for DSL to ship, or provide notice of a particular strike or riot the beginning and end of which would be ascertained for purposes of establishing the period of the *force majeure* condition.

20. After purporting to invoke the *force majeure* clause, DSL continued to ship under SC 231 and to claim the discount prices established thereunder. In total, DSL shipped 1,541.25 FEUs of cargo under SC 231 after May 25, 1988.

21. These shipments, and the claim of discount thereunder, were irreconcilable under SC 231 with the continuing claim of *force majeure.*

22. In October of 1988, DSL sought an extension of SC 231, or the formation of a new service contract that would "roll in" the shortfall. (Ex. 68) On October 10, 1988, DSL wrote to HKIL demanding an extension of SC 231 until May 31, 1989. (Ex. 68) HKIL did not agree to an extension or a new contract.

23. As stated, DSL shipped 2,687 FEUs of cargo under SC 231. Since the minimum volume was 3,500 FEUs, DSL had a shortfall of 813 FEUs. The liquidated damages under SC 231 are calculated as follows: 813 FEUs of shortfall multiplied by $1,500 per FEU, for a total of $1,219,500.[4] No part of the liquidated damages has been paid, although payment has been duly demanded.

24. HKIL had unutilized space of approximately 14,447 TEUs, or 7,223.5 FEUs in the trade lanes covered by SC 231 during the term of the contract. (Ex. 228) This space was available for the transportation of cargo under SC 231. Accordingly, HKIL suffered actual damages for the shortfall of 813 FEUs. HKIL's actual damages are measured by its marginal revenues, minus its marginal costs, for the shortfall. HKIL's actual damages are approximately $1,049,405, representing approximately $1,291 per FEU.

25. SC 231 contains a "Most-Favored-Shipper" clause. Clause 7(FF) I of SC 231 states:

If tariff Freight All Kinds (FAK)/GDSM rate including contract FAK/GDSM rate, with lesser volume, filed with FMC subsequent to the date of effectiveness of

---

4. The computer liquidated damages of $1,219,-500 are lower than damages resulting from re-rating DSL's cargo to HKIL's tariff. Rerating would require DSL to pay additional freight in the amount of $2,032,020. (Ex. 219) That amount includes an additional $1,118,414 for rerating to tariff of the cargo shipped under SC 231 after May 25, 1988.

this contract should fall below the agreed GDSM rates in AA through BB less the transloading allowance as stipulated in Clause 8 and less the off dock compensation as per NN, then shipment will be rated at the lower rate level less seven and a half (7.5) per cent. (Ex. 1, Clause 7(FF)I)

26. Throughout the term of SC 231, and until well after this lawsuit commenced, both DSL and HKIL treated the Most-Favored–Shipper clause of SC 231 as referring only to HKIL's tariffs and contracts, not to third-party carrier contracts. (Ex. 111–164) During the term of SC 231, both HKIL and DSL reviewed, audited and verified the rates that HKIL charged under SC 231. As a result, HKIL and DSL rated at least 652 FEUs for cargo shipped by DSL under SC 231 according to HKIL's tariff rate, rather than the SC 231 rate, when the tariff rate fell below the SC 231 rate. (Ex. 111–164) The parties, however, did not rate any FEUs of DSL's cargo shipped under SC 231 to any third-party carriers' tariffs or contracts. (Ex. 111–164.) Nor did the parties rate any FEUs of cargo under the 1987 service contract between HKIL and DSL (which contained a clause similar to Clause 7(FF) of SC 231) to third-party tariffs or contracts. HKIL never made service contracts whose Most–Favored–Shipper clauses were tied to the rate charged by third-party carriers.

27. At the time SC 231 was executed, and for the entire period of performance, there were third party carrier contracts in existence which would have produced the rates under SC 231, below those specifically set in the agreement itself, if DSL's construction of the contract were correct. The court finds it not credible that the parties intended to fix, in SC 231, specific contract rates which were not applicable when fixed or at any time thereafter.

28. The court finds that, taken within the context of the entirety of SC 231, clause 7(FF) is best construed to apply only to tariff and contract rates of HKIL.

29. The court did not believe, and wholly rejected DSL testimony to the effect that the clause 7(FF)I was intended as a "Crazy Eddie" clause. Since the "intent" on the part of HKIL was attributed to Shem, an HKIL representative who had neither actual nor apparent authority to execute or construe SC 231, the court would have given no weight to this testimony even if believed.

30. On January 14, 1988, HKIL and DSL entered into Service Contract No. 233 (hereinafter "SC 233" or "the contract"). SC 233 covered the transportation of Freight All Kinds ("FAK") cargo to be shipped by DSL in containers from certain ports on the U.S. West Coast to certain ports in the Far East. (Ex. 2, Clause 3) SC 233 required DSL to ship a minimum volume of one hundred (100) FEUs of cargo with HKIL during the term of the contract. (Ex. 2, Clause 4) SC 233 included a schedule of various HKIL rates and charges for the transportation of cargo, depending upon the size of the container. (Ex. 2, Clause 5) The duration of SC 233 was from January 15, 1988 through January 14, 1989. (Ex. 2, Clause 2) The service commitment of SC 231 required HKIL to make available during the term of the contract vessel capacity and equipment adequate to carry the minimum quantity commitment of cargo tendered by DSL, subject to the requirements of the contract, including a minimum of 10 FEUs per sailing, and additional space on a best efforts basis, subject to availability. (Ex. 2, Clause 6) The liquidated damages for nonperformance under SC 233 was $750 per FEU of shortfall under the contract. (Ex. 2, Clause 7).

31. On January 15, 1988, the effective date of SC 233, a copy thereof, and a statement of its essential terms, were duly filed in tariff format with the FMC in accordance with the Shipping Act of 1984.

32. HKIL made available, during the term of SC 233, vessel capacity and equipment adequate to carry the minimum quantity commitment of cargo tendered by DSL under the contract, subject to the requirements of the contract. (Ex. 77, 228)

33. DSL shipped a total volume of 42.5 FEUs under SC 233, resulting in a shortfall of 57.5 FEUs. (Ex. 14) Liquidated damages under SC 233 are calculated as fol-

lows: 57.5 FEUs of shortfall multiplied by $750 per FEU, yields a total of $43,125. No part of the liquidated damages has been paid, although payment has been duly demanded.

34. DSL has furnished various services to HKIL in the amount of $87,842.24. This includes $10,918.89 for transloading (Ex. 316, 302, 311), $33,999.87 for drayage services in Hong Kong (Ex. 301, 305, 311), $36,442.12 for other services and charges in Taiwan (Ex. 300, 311), $3,589.00 for demurrage, $1,428.36 for equipment repair, and $1,464.00 for use of DSL chassis (Ex. 302, 311), no part of which has been paid.

35. The testimony of the DSL witnesses was, even when unopposed, lacking in credibility and characterized by sudden memory substitution. Accordingly DSL failed to carry its burden of proof of the various facts asserted in its defense.

### CONCLUSIONS OF LAW

1. Any Findings of Fact which properly should be categorized as Conclusions of Law are incorporated herein by this reference as though set forth in full.

2. HKIL was at all relevant times an "ocean common carrier" within the meaning of Section 3 of the Shipping Act of 1984 (46 U.S.C.App. § 1702(18)), because it was a vessel-operating common carrier that assumed responsibility for the transportation of the subject cargo by water between the United States and a foreign country for compensation.

3. DSL was at all relevant times a "shipper" within the meaning of Section 3 of the Shipping Act of 1984 (46 U.S.C.App. § 1702(23)), because DSL was an owner of the subject cargo or a person for whose account ocean transportation of such cargo was provided.

4. On January 9, 1988, HKIL and DSL entered into SC 231. On January 12, 1988, the effective date of SC 231, a copy thereof, and a statement of its essential terms, were duly filed in tariff format with the FMC, in accordance with the Shipping Act of 1984.

5. HKIL has duly performed all of its obligations under SC 231. In that regard, HKIL provided containers and space to DSL on a regularly scheduled basis during the one-year term of SC 231, and provided more than 50 voyages to DSL.

6. No *force majeure* occurred under SC 231. Under Clause 10 of SC 231, in order to constitute a *force majeure*, an event must render it "impossible" or "unprofitable" to ship cargo under the contract. DSL has failed to prove that the claimed events made shipments under SC 231 "impossible" or "unprofitable." It is well-established that in order to constitute a *force majeure*, an event must be the proximate cause of nonperformance of the contract. *Wheeling Valley Coal Corp. v. Mead,* 186 F.2d 219, 223 (4th Cir.1950); *Oosten v. Hay Haulers, Dairy Employees & Helpers Union,* 45 Cal.2d 784, 291 P.2d 17, 20, 21 (1955). DSL always had the ability to ship 3,500 FEUs of cargo with HKIL, but chose to ship that cargo with other carriers instead.[5] Hence, the claimed events—"strikes," "riots," "civil commotion," "loss or partial loss of market," "changing markets," and "business declines"—did not proximately cause the shortfall.[6]

---

5. DSL's contention that the shortfall resulted because it was forced by its customers to ship cargo with other carriers due to HKIL's longer transit times is rejected. DSL shipped cargo with other carriers having long transit times, such as COSCO, at the same time as voyages were being made by HKIL vessels. (*See e.g.,* Ex. 32, 33, 45, 36). This supports the inference that the cargo shipped on those other carriers could have been shipped with HKIL. In any event, although perhaps not the fastest carrier in the trade, HKIL was under no contractual obligation to be such.

6. If a *force majeure* were deemed to have occurred, however, the cargo purportedly shipped by DSL under SC 231 after the *force majeure* commenced would have to be rerated to HKIL's tariff. Clause 10 of SC 231 provided, *"Each party is excused from this contract for reasons of force majeure."* (Ex. 1, Clause 10 (emphasis added)) In the absence of a service contract, the carrier's tariff applies. Hence, if a *force majeure* had occurred on about May 25, 1988, HKIL's duty to transport DSL's cargo at a discount would have terminated, rendering DSL liable for additional tariff charges of at least $1,118,414. (Ex. 219)

7. HKIL never accepted DSL's claim of *force majeure,* or any extension of SC 231, or any new service contract which would "roll in" the shortfall under SC 231.

8. DSL's other affirmative defenses to HKIL's claim of breach are invalid and unsupported by evidence.

9. DSL breached SC 231 by shipping only 2,660 FEUs of cargo against the 3,500 FEU minimum volume commitment, leaving a shortfall of 813 FEUs.

10. HKIL has a private right of action under the Shipping Act of 1984 to collect liquidated damages for breach of service contract. *See Sea–Land Service, Inc. v. Murray & Sons' Co.,* 824 F.2d 740, 742 (9th Cir.1987); 46 U.S.C.A.App. § 1709(b)(1), (b)(2), and (b)(4). Hence, the liquidated damages provision of SC 231 is valid and enforceable as a matter of law. *Id.; see also Yangming Marine Transport Corp. v. Formost Int'l, Inc.,* 25 S.R.R. 930, 1990 WL 17729 (S.D.N.Y.1990). Further, the liquidated damages provision is valid and enforceable because it is a reasonable estimate of HKIL's likely loss in the event of a shortfall under the contract. *See* Cal. Civ.Code § 1671(b).

11. On January 14, 1988, HKIL and DSL entered into SC 233. On January 15, 1988, the effective date of SC 233, a copy thereof, and a statement of its essential terms, were duly filed in tariff format with the FMC in accordance with the Shipping Act of 1984.

12. HKIL duly performed all of its duties under SC 233. In that regard, HKIL made available during the term of SC 233 sufficient vessel capacity and equipment to carry the minimum quantity commitment of cargo tendered by DSL under the contract, subject to the requirements of the contract.

13. DSL breached its duties by failing to ship the minimum quantity of cargo.

14. Accordingly, DSL is liable to HKIL for liquidated damages for breach of SC 231 in the amount of $1,219,500, and for breach of SC 233 in the amount of $43,125, no part of which has been paid, although duly demanded.

15. DSL is liable to HKIL for prejudgment interest on the liquidated damages due under SC 231 from January 12, 1989, the date of breach of SC 231; and on the liquidated damages due under SC 233 from January 15, 1989, the date of breach of SC 233, respectively, until judgment, at the rate of 10 percent per annum. Cal.Civ. Code § 3289(b); *Edinburgh Assurance Co. v. R.L. Burns Corp.,* 669 F.2d 1259, 1262–63 (9th Cir.1982). Costs of suit are awarded to HKIL.

16. DSL's First Cause of Action for breach of contract concerning damaged goods includes claims that are time-barred by the one-year limitation of the Carriage of Goods by Sea Act (46 U.S.C.A.App. § 1303(6)). The First Cause of Action was abandoned during the course of the trial, and is dismissed.

17. HKIL is liable to DSL under DSL's Second Cause of Action for breach of contract concerning charges for transloading, drayage, demurrage, equipment repairs and other charges in the amount of $87,842.24. DSL is entitled to a set-off in this amount.

18. DSL's Third Cause of Action for breach of contract based upon the Most–Favored–Shipper provision of SC 231, Clause 7(FF), is contrary to the plain language of the contract, and contrary to the conduct of the parties. The rerating mentioned in Clause 7(FF) refers to HKIL's tariff and contracts, not to third-party contracts. The parties never treated SC 231 as permitting rating to third-party contracts. Accordingly, DSL's Third Cause of Action is dismissed.

19. DSL's Fourth and Fifth Causes of Action for spoliation of evidence are dismissed for failure of proof.