NISSHO–IWAI CO., LTD.,
Plaintiff-Appellee,

v.

OCCIDENTAL CRUDE SALES, INC.,
Defendant-Appellant.

Nos. 82–2308, 82–2471.

United States Court of Appeals,
Fifth Circuit.

April 23, 1984.

Phillips, Nizer, Benjamin, Krim & Ballon, Louis Nizer, Paul Martinson, New York City, for defendant-appellant.

Sewell & Riggs; Gordon A. Holloway, Robert E. Meadows, Wm. B. Allison, Houston, Tex., for plaintiff-appellee.

Before CHARLES CLARK, Chief Judge, and GOLDBERG and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

This diversity action involves a contract dispute between the Nissho-Iwai Company, Ltd. ("Nissho") and Occidental Crude Sales, Inc. ("Occidental"). Occidental appeals from a jury verdict awarding Nissho contract damages and fraud damages arising from Occidental's failure to perform a crude oil agreement. We hold that there was no reversible error in the finding that Occidental was liable for breach of contract. We reverse the damage award, however, and remand for a new trial limited to determining contract damages. Finally, we reverse the fraud verdict.

## FACTS

Nissho is a Japanese corporation that distributes oil to Japanese buyers. Occidental is an American corporation that explores for and produces oil. In 1965, Occidental obtained a number of "oil concessions" from the High Petroleum Council and the Council of Ministers of Libya. The concessions permitted Occidental to drill for oil in two separate blocks of property ("Concession 102" and "Concession 103"). The producing wells were managed by the Libyan Government, and Occidental was responsible for pipelines that transported oil from the wells to an export terminal in Zueitina. Each concession agreement provided for a royalty payment of 12.5 percent and a tax payment of 50 percent to the Government on each barrel of oil.

On September 1, 1969, a Revolutionary Government under Colonel Moammar Khadafy deposed the King of Libya and assumed control. In January 1970, Colonel Khadafy formed a committee to negotiate higher prices with Libyan oil producers; but the companies were unwilling to comply. Khadafy imposed a series of production restrictions; and in August 1973, he nationalized 51 percent of Occidental's concessions.

## THE CONTRACT

Occidental had been under contract since 1971 to provide Nissho with "Zueitina Medium" crude oil produced from Concession 102. Zueitina Medium is a low sulphur oil that is particularly useful to electric utility companies required to meet air pollution standards. After receiving the oil, Nissho would resell it to various Japanese power companies.

In 1973, Occidental, aware of the past difficulties with the Libyan Government, renegotiated its contract with Nissho. On October 4, 1973, Occidental and Nissho signed the new agreement, known as Contract 1038. Nissho agreed to purchase and Occidental agreed to supply 750,000 barrels of oil a month through December 31, 1978. The contract contains a "force majeure" clause excusing nonperformance caused by

> executive or administrative orders or acts [of the Libyan Government], ... or by breakdown or injury to ... producing ... or delivering facilities, ... or by any other event, whether or not similar to the causes specified above ..., which shall not reasonably be within the control of the party against whom the claim would otherwise be made [i.e. Occidental in this case].

The contract also provides that it is to be governed by the laws of California.

## EVENTS LEADING UP TO BREACH OF CONTRACT 1038

### Underliftings by Nissho

The parties performed their respective duties for several months. Troubles developed, however, in 1974. First, during several months in 1974 and 1975, Nissho failed to "lift" its required allotment of oil.[1] The reasons for these "underliftings" are disputed. There is evidence that Occidental supplied reduced quantities during January and March, 1974, because of the Arab-Israeli War. There is also evidence that some of the underliftings in late 1974 were caused by the Nereus Shipping Company ("Nereus") which "nominated" ships to receive oil at such close intervals that Occidental could not fill them. (Nereus was required to supply tankers pursuant to a contract of affreightment with Nissho.) The parties, however, continued to work under the contract. As one officer of Occidental testified, the company elected not to take legal action against Nissho, preferring to reach a commercial solution. Trial Transcript at 1101.

### Actions of the Libyan Government

During this period, actions of the Libyan Government affected Occidental's production. On February 7, 1974, the Government and Occidental entered into an Exploration and Production Sharing Agreement under which the Government received 81 percent of oil production. In the following months, the Government ordered increases or decreases in production from various wells. Occidental objected to some of the charges and negotiated remedial production quotas.

The parties reached an impasse in the summer of 1975, however. On July 31, the Government announced that Occidental's production exceeded the limits set in Petroleum Regulation Number 8[2] and that the wells in Concession 103 would be closed temporarily for testing. Then, on August 28, 1975, the Government issued a cutback order to become effective September 1, 1975. Occidental objected to the cutback, arguing that it violated the concession agreements and that Occidental would have "a right to look to the Government for reimbursement of all direct and consequential damages." Plaintiff's Exhibit 11. In a separate letter, Occidental objected to the Government's failure to pay for certain oil exploration (as required by the Exploration and Production Sharing Agreement).

When the Government failed to restore production within seven days, Occidental sought arbitration of the claims. In addition, on September 30, Occidental withheld $117 million that it owed the Government: including $40 million for oil purchased from the Government, and $77 million in back taxes and royalties.

The Government notified Occidental that if the payments were not made, the Government would prevent Occidental from exporting oil after October 1, 1975. Occidental refused to pay and the government placed an embargo on exports. Thus, Occidental was unable to perform its contract with Nissho that month.

The embargo on exports lasted until Occidental and the Government settled their disputes on December 3, 1975. Pursuant to the settlement agreement, the embargo order was lifted, the pending arbitrations were withdrawn, and the production of Occidental was restored to 300,000 barrels per day.

### Pipeline Breakdowns

Breakdowns in the oil pipeline leading from Concession 102 to Zueitina also affected Occidental's ability to perform the contract with Nissho. Leaks appeared in early 1975; and Occidental shut down the pipeline for repairs from June 20 to July 10. The leaks persisted, however; and in October, Occidental began major repairs: the pipeline was pressure tested, holes

---

1. Nissho did not lift any oil in January, March, June, July, August, October or December, 1974, nor in January, March, April, June or August, 1975. It purchased less than the required amounts in April, 1974 and July, 1975.

2. Occidental argues that the regulation did not apply to its concessions, because the regulation was adopted after the concessions were granted. It had been applied to Occidental off and on in the past, however. Trial Transcript at 367–371.

were dug, and a section of the pipeline was removed.

After the oil embargo ended in December, 1975, Occidental attempted to reconnect the pipeline and repair any remaining leaks. Yet, when the pipeline was reattached, Occidental discovered sand in the line. To correct that problem, Occidental again had to remove a section of the line. Consequently, the pipeline was shut down from October, 1975, through May 10, 1976, and no oil was produced from Concession 102 during that period.

*Breach by Occidental*

In sum, Occidental failed to supply Nissho with any oil during the last four months of 1975 and the first four months of 1976. The oil embargo prevented performance between October and December, 1975. Then, pipeline problems stopped the flow of oil until May, 1976. The reason for the breach in September, 1975, is unclear.[3] However, Occidental wrote Nissho on more than one occasion in August and early September, stating that the September cargo would not be available because of production restrictions. That representation was untrue.[4]

### EFFECTS OF THE BREACH ON NISSHO

*The Kansai Contract*

In 1969, representatives of Nissho approached the Kansai Electric Power Company ("Kansai") offering to sell them crude oil. Kansai was in the market for low sulphur crude; and by the end of 1971, Kansai made a commitment to purchase oil from Nissho. Kansai and Nissho signed a written contract for the sale of Zueitina Medium between October 1, 1972 and March 31, 1976. Testimony at trial also showed that Nissho was prepared to extend the contract and that such extensions were fairly automatic. Nissho could expect to earn regular profits on sales to Kansai until December 31, 1978. Such profits were dependent, of course, on the regular availability of Zueitina Medium—i.e. on consistent performance by Occidental of its contract with Nissho.

Kansai became concerned in early 1976 that Nissho could not provide oil consistently. Occidental had not supplied Nissho with Zueitina Medium since September, 1975. Kansai contacted Nissho seeking assurances that future supplies would be consistent. Because Occidental's pipeline was still damaged and Occidental could not assure a regular supply, Nissho in turn could not give adequate assurances to Kansai. Kansai "found no alternative but to cancel" its contract with Nissho in January, 1976. Trial Transcript at 600. Negotiations for extension of the contract broke down before May, 1976.

At trial, Nissho introduced evidence that the loss of commission profits through 1978 resulting from the cancellation of the Kansai contract amounted to at least $1,769,-950. In addition, it introduced testimony that it lost $3,246,905 in interest that would have accrued during the 40 days between each payment by Kansai and the time it had to pay Occidental.[5]

*The Nereus Settlement*

Nissho also suffered damages when it settled a dispute with its shipper. In January 1972, Nissho entered into a contract of affreightment with the Nereus Shipping Company ("Nereus"). Beginning on October 1, 1972, Nereus was to transport from Libya to Japan the crude oil that Occidental was to supply Nissho.

On February 10, 1976, Nereus filed an arbitration against Nissho for failing to

---

**3.** Occidental claims that Nissho didn't nominate a ship in time. Nissho argues that Occidental could have performed anyway.

**4.** The restrictions at that point were on oil from Concession 103, not 102 which produced Zueitina Medium.

**5.** Occidental objects that the calculations offered at trial were based on a 30-day "float" and only amounted to $2,435,178.85. However, the witness who made those calculations (Mr. Matsumoto) also testified that the float period was actually longer than 30 days. The evidence indicated that the period was roughly 40 days. Thus, the counsel for Nissho admonished the jury to adjust the 30-day figure to take account of the extra 10 days during which interest would have accrued. *See infra* notes 25, 27.

load ships in September and October, 1975. Eventually, the proceeding was expanded to include Nereus's claim that Nissho was in complete breach of the contract of affreightment. Nereus sought damages of over $5,000,000; Nissho counterclaimed for $1.5 million. In July, 1977, the parties agreed to a settlement in which Nissho paid $2,225,000 to Nereus. The Nereus litigation also cost Nissho $43,000 in attorney fees.

## NEGOTIATIONS BETWEEN OCCIDENTAL AND NISSHO AFTER REPAIR OF THE PIPELINE

After Occidental notified Nissho that the pipeline from Concession 102 was repaired, the parties met and exchanged letters concerning future performance. Because Nissho had lost Kansai as a customer, it proposed to suspend or cancel the contract with Occidental. In a letter dated May 12, 1976, Occidental replied that it would prefer to suspend the contract from October, 1976, through March, 1977, to give Nissho "time to persuade Kansai to honor its contract and resume lifting or alternatively find other Buyers for the crude oil." Plaintiff's Exhibit 86.[6] On May 27, Nissho wrote back to accept the proposal on the condition that any lifting requirements would be waived for calendar year 1976 and throughout the suspension period. The letter also stated: "We reconfirm our agreement that any lifting requirements for calendar years 1974 and 1975 have been fulfilled and satisfied." Plaintiff's Exhibit 161.[7]

Nissho was unable to reestablish its contract with Kansai. It did make two "spot market" sales to Kansai in July, 1976, and September, 1976, but it has never obtained another long-term contract with Kansai.

## PROCEEDINGS BELOW

Nissho brought an action that was transferred by consent to the United States District Court for the Southern District of Texas on April 21, 1980. The amended complaint sought damages for breach of contract and fraud.[8]

### The First Trial

The case proceeded to trial before a jury on February 1, 1982; and the jury returned

---

**6.** The full proposal reads:

Rather than pursuing the termination of the agreement, Seller has requested us to propose to you to suspend deliveries of the crude oil for six months during 1st October through 31st March, 1977 which we believe would give you sufficient time to persuade the Kansai Electric people to honour the contract and resume lifting or alternatively find other Buyers for the crude oil. Should efforts fail to persuade them to receive further deliveries of Zueitina medium crude, say by the end of February next year, then we propose, without any prejudice to our rights, to reconvene some time in March to discuss either;
a) keeping the agreement alive with a diminished rate of delivery;
b) agreeing a further 3/6 months' suspension or
c) cancellation of the agreement as you have proposed.
*Id.*

**7.** Nissho's letter reads in pertinent part:

Before discussing the merits of your proposal, it is important for us to reconfirm some understandings which have previously been reached and clarify our current situation. We assume from your proposal that any lifting requirements applicable to the continua-

tion of Contract 1038 will be waived for all of calendar year 1976 as well as through the period that such contract is suspended in the same manner as lifting requirements were dealt with for calendar years 1974 and 1975. We reconfirm our agreement that any lifting requirements for calendar years 1974 and 1975 have been fulfilled and satisfied. We also assume that we can continue to expect your good support and aid in our negotiations and proceedings involving the owners of the transporting vessels. Finally, we must point out again that Kamden (Kansai Electric Power) has cancelled their contract with us and any attempt to persuade them to purchase more Zueitina Medium will be a very difficult task.

With the above points accepted, we are willing to adopt your proposal to provide for a suspension of Contract 1038 through the 31st of March, 1977, provided, however, that such suspension shall not extend the expiration date of Contract 1038, which is December 31, 1978.
*Id.*

**8.** The fraud claim is based on several misrepresentations by Occidental including the statement that production restrictions caused its breach in September, 1975.

its verdict and answers to special interrogatories on February 10, 1982. The jury found that Nissho had waived Occidental's performance for the periods 1974, 1975 and 1976, but that Occidental was liable for $2,269,000 in contract damages.[9] The jury also found that Occidental had acted fraudulently and was liable for $2,250,000 in punitive damages; but the jury awarded no compensatory damages for fraud. After polling the jury, Judge O'Conor permitted them to leave, saying "You will be excused at this time." Record at 418.

Immediately after they had left, Judge O'Conor became concerned because the jury had awarded punitive damages without any compensatory damages on the fraud claim. He recalled the jury and asked them if they knew that actual damages must be awarded before punitive damages are proper. The foreman said they did not know that; and Judge O'Conor sent them back into the jury room for further deliberations.

They returned with a verdict in favor of Nissho, awarding $2,269,000 damages on the contract claim and $4,500,000 ($2,250,000 actual damages and $2,250,000 punitive damages) on the fraud claim. They again found that Nissho had waived Occidental's performance under the contract.

After the second verdict was returned, both parties moved for judgments in their favor. Before deciding the motions, Judge O'Conor declared a mistrial *sua sponte* and ordered a new trial. Conflicts in the jury interrogatories and statements by the foreman revealed confusion and misunderstanding on the part of the jury. Record at 358.

### The Second Trial

The case came on for retrial on May 10, 1982. The new jury reached a verdict on May 24, 1982. It found Occidental liable to Nissho for breach of contract and awarded $7,025,000 in damages.[10] It also found Occidental liable for fraud and awarded $70,250 in compensatory damages and $210,750

in punitive damages. Finally, it found that Occidental was not entitled to an offset because of Nissho's underliftings. This appeal follows.

### ISSUES

Occidental raises a number of challenges to the judgment in this case. It argues that Judge O'Conor erred in the first trial by recalling the jury to reconsider its verdict; thus, the original verdict should stand and Occidental is entitled to a directed judgment. We do not even reach this claim, however. Regardless of whether it was proper to recall the jury, Judge O'Conor had broad discretion to declare a mistrial and order a new trial when he detected confusion in the jury verdict.

Occidental also raises a number of issues concerning the second trial. It argues, first, that the judge erred in charging the jury about the Force Majeure clause. Occidental claims that the trial court should not have instructed the jury to consider whether an excusing event under the clause was within the reasonable control of Occidental. We hold that the instruction was proper. Moreover, we hold that Judge O'Conor properly refused a qualifying charge that Occidental had requested.

Occidental argues next that both parties waived performance requirements and that the jury disregarded the court's instructions when it found only a unilateral waiver by Occidental. We conclude, however, that the instructions permitted and the evidence supported a finding of unilateral waiver.

In sum, we affirm the jury verdict that Occidental was liable to Nissho for the breach of Contract 1038. The damage award is suspect, however. Nissho introduced evidence of profits lost during a period when the contract was in suspension. We hold that such profits are not compensable. Furthermore, because the general verdict far exceeds Nissho's proof at trial, a simple remittitur is inappropriate. We

---

9. This figure represents the settlement of the Nereus claim. The jury awarded no damages for the cancellation of the Kansai contract.

10. The special interrogatory form at this trial did not ask whether Nissho had waived Occidental's performance.

remand for a new trial limited to determining contract damages.

We also reverse the judgment that Occidental was liable for fraud. Nissho failed to prove that fraud, rather than the breach of Contract 1038, caused the alleged injuries to its good will, reputation, and business relationships.

Finally, we hold that Judge O'Conor did not abuse his discretion in taxing costs for witness fees, enlarged photocopies, and deposition expenses. Other claims raised by Occidental on appeal are without merit.

## DISCUSSION

### RECALL OF THE JURY AND GRANT OF NEW TRIAL

■ Occidental argues that Judge O'Conor erred during the first trial in recalling the jury after it had been discharged. Occidental takes the position that once a jury has been discharged, it may not change its verdict even if recalled by the court for that purpose. *See Firm v. Carnegie Illinois Steel,* 68 F.Supp. 423, 430 (W.D.Pa. 1946). If the jury could not change its verdict, then the first verdict arguably stands, and Occidental would deserve a judgment notwithstanding the verdict on both the contract and fraud claims. The contract claim would fall, because the first jury found that Nissho had waived Occidental's performance. The award of punitive damages for the fraud claim would be improper, because the jury originally awarded no compensatory damages.

However, we need not reach the issues involving discharge of the jury, because we find that Judge O'Conor acted within his discretion in ordering a new trial. Judge O'Conor declared a mistrial and ordered a new trial *sua sponte* pursuant to Federal Rule of Civil Procedure 59(d). A trial judge may order a new trial if he suspects that the jury verdict reflects confusion. *See Lemon v. Bank Lines,* 656 F.2d 110, 116 (5th Cir.1981); *Weingart v. Allen & O'Hara,* 654 F.2d 1096, 1106 (5th Cir., Unit

B, 1981). The "decision to grant a new trial may be reversed only for a clear abuse of discretion." *Lemon, supra.*

In the present case, there was certainly evidence that the first jury misconstrued the judge's instructions. Confusion surfaced in the jury's decision to award punitive damages for fraud even though it had awarded no actual damages on the claim. When questioned by Judge O'Conor, the foreman admitted that he was confused by the instructions. He felt that compensatory damages for the breach of contract would support punitive damages for the fraud.

Apparently, "the confusion resulted from the [judge's] instruction of not awarding double damages." Record Excerpts at 53.[11] He had instructed the jury not to overcompensate the plaintiffs by awarding damages for the same injuries twice—once as "contract damages" and again as "fraud damages." The actual damages for fraud had to arise from different injuries than the damages for contract breach. The jury must have been confused by the distinction, though, and concluded that actual damages resulting from the breach of contract would justify punitive damages for fraud. There was also a danger that the jury misunderstood the difference between contract and fraud damages. Judge O'Conor acted well within his discretion when he ordered a new trial for fear of jury confusion. *Cf. Weingart v. Allen & O'Hara, supra,* 654 F.2d at 1106 (jury confused about measurement of fraud damages).

■ Occidental argues, however, that the judge should have ordered only a partial retrial of the fraud claim; he abused his discretion in ordering a complete new trial. We disagree. Courts must order a complete retrial of issues "unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products v. Champlin Refining,* 283 U.S. 494, 500, 51 S.Ct.

---

11. Judge O'Conor voiced his concern that this particular instruction caused the confusion. Although the judge confirmed his fears by interviewing the foreman of the jury, the first set of inconsistent answers to the court's special interrogatories actually revealed the confusion. *Compare University Computing v. Lykes-Youngstown,* 504 F.2d 518, 547 n. 42 (5th Cir.1974).

513, 515, 75 L.Ed. 1188 (1931); *see also Davis v. Safeway Stores,* 532 F.2d 489, 491 n. 3 (5th Cir.1976); 11 *Wright and Miller, Federal Practice and Procedure* § 2814, at 92 (Rule 59 drawn in light of *Gasoline Products* case). Such was not the case here. The fraud claim arose out of the acts surrounding the breach of contract, and an understanding of the fraud required an understanding of the contract claim.[12]

We hold that Judge O'Conor did not abuse his discretion in ordering a complete new trial.[13]

## CHALLENGES TO THE SECOND TRIAL

### FORCE MAJEURE

■ Occidental raises several supposed errors in the second trial as grounds for reversing that judgment. Occidental objects to the giving of one jury instruction and the failure to give another with regard to force majeure. At trial, Occidental attempted to defend its nonperformance on the ground that acts of the Libyan Government (in particular, the embargo) and pipeline breakdowns prevented Occidental from supplying oil. Both excuses come within specific provisions of the "Force Majeure" clause in Contract 1038, which provides in pertinent part:

Neither party shall be liable for ... loss, damage, claims or demands of any na-

ture whatsoever due to delays or defaults in performance ... caused by impairment in any manner of [Occidental's] crude oil supply, ... [by] *executive or administrative orders or acts* ... of any ... government, [by] *breakdown or injury to ... producing ... or delivering facilities,* ... [by] *imposition of restrictions* ... by any ... government, ... or by *any other event,* whether or not similar to the causes specified above ..., *which shall not be reasonably within the control of the party* against whom the claim would otherwise be made.

Plaintiff's Exhibit 88, at 4, § XV (emphasis added).

Judge O'Conor instructed the jury that

[i]n order to find that Occidental's non-performance was excused under the force majeure clause you must find from a preponderance of the evidence (1) that the excusing event or events relied upon by Occidental actually prevented Occidental's performance, *and* (2) that the excusing event or events were not reasonably within the control of Occidental or its supplier.

Record at 210. Occidental objects to the second element of the charge, which required the jury to consider whether pipeline difficulties and the Libyan oil embargo were within the reasonable control of Occidental.[14] According to Occidental, the contract clause distinguishes between specif-

---

**12.** In addition, the original jury verdict manifested a clear inconsistency with respect to the contract claim. It is very likely that the jury was confused when it decided both that Nissho had waived Occidental's performance under Contract 1038 and that Occidental was liable to Nissho for damages for the breach. *See* Record at 416; Record Excerpts at 57, 59. Although Judge O'Conor did not specify this inconsistency as a ground for mistrial, *see* Fed.R.Civil Proc. 59(d), it is not entirely irrelevant to our decision whether a complete retrial was proper.

**13.** We are not saying that we would have necessarily reversed a decision by Judge O'Conor to declare a partial mistrial. We merely hold that he did not abuse his discretion in ordering a complete new trial. Notably, Occidental has cited no precedent for reversing a trial judge's decision to order a complete new trial.

**14.** Occidental also urges that a court should not consider whether Occidental had reasonable

control over the actions of the Libyan Government, because such a determination would pass judgment on the act of a foreign sovereign. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). This issue was not raised, however, in Occidental's first appellate brief. The argument first appeared in the Reply Brief. An [appellant's] original brief abandons all points not mentioned therein.... *Martin v. Atlantic Coast Line Railroad,* 289 F.2d 414, 417 n. 4 (5th Cir.1961); *see also General Chemicals v. Exxon Chemical, USA,* 625 F.2d 1231, 1233 n. 3 (5th Cir.1980). Because the "Act of State" claim was entirely separate from the other arguments pertaining to force majeure and because it was not raised in response to any novel argument in Appellee's Brief, the claim is waived on appeal. We grant Nissho's motion to strike the "Act of State" claim from Occidental's Reply Brief.

ically enumerated events and the general category of "any other event;" only the latter must be beyond the reasonable control of the Seller. Occidental points out that in California, a limiting exception applies only to the last phrase preceding it, unless the context indicates otherwise. *See, e.g., In re Estate of Colyear,* 17 Cal. App.3d 173, 94 Cal.Rptr. 696, 702 (1971); *Grant v. Hipsher,* 257 Cal.App.2d 375, 383, 64 Cal.Rptr. 892 (1967).

■ In this case, however, the California law of force majeure requires us to apply a reasonable control limitation to each specified event, regardless of what generalized contract interpretation rules would suggest. Thus, Judge O'Conor did not err in giving such an instruction. "Force majeure" has traditionally meant an event which is beyond the control of the contractor. *See* Squillante and Congalton, *Force Majeure,* 80 *Comm.L.J.* 4, 5 (1979).[15] The common law defense [16] of impossibility due to Act of God requires the defendant to prove that an excusing event is beyond his control, *id.* at 5; and contractual force majeure provisions typically incorporate this requirement, *see Eastern Air Lines v. McDonnell Douglas,* 532 F.2d 957, 991 (5th Cir.1976).

■ The term "reasonable control" has come to include two related notions. First, a party may not affirmatively cause the event that prevents his performance. The rationale behind this requirement is obvious. If a contractor were able to escape his responsibilities merely by causing an excusing event to occur, he would have no effective "obligation to perform." *See* Squillante and Congalton, *supra,* at 4; 2 *Anderson, Uniform Commercial Code* § 2–615:17 (1972).

The second aspect of reasonable control is more subtle. Some courts will not allow a party to rely on an excusing event if he could have taken reasonable steps to prevent it. *See Oosten v. Hay Haulers Dairy*

*Employees & Helpers Union,* 45 Cal.2d 784, 291 P.2d 17, 20–21 (1955); 6 *Corbin on Contracts,* § 1342, at 328; *Anderson, supra.* The rationale behind this requirement is that the force majeure did not actually prevent performance if a party could reasonably have prevented the event from occurring. The party has prevented performance and, again, breached his good faith obligation to perform by failing to exercise reasonable diligence. *See Oosten, supra* at 21.

The California Supreme Court has read into contractual force majeure provisions both aspects of "reasonable control"—good faith in not causing the excusing event and diligence in taking reasonable steps to ensure performance. In *Oosten, supra,* the parties had entered into a contract for the sale of milk. Clause 12 of the contract provided:

> In case of strike, lockout, or other labor trouble ... which shall render it impossible for [either party to perform], no liability for non-compliance with this agreement caused thereby ... shall exist or arise....

291 P.2d at 19. The clause did not explicitly refer to "reasonable control." Yet, the Court invoked the concept in describing the obligations of a party relying on a force majeure clause:

> In the instant case we construe clause 12, with respect to impossibility of performance, the same as it is construed generally in contract law with regard to whether performance has been made impossible. The only things the clause adds are that certain things—labor disputes, strikes—may excuse performance, when without it they might not, but the question remains whether those things have been made impossible. As has been said: "We cannot always be sure what 'causes are beyond the control' of the contractor. Many fires can be prevented by the use of foresight and sufficient expenditure. Most strikes can be avoid-

---

**15.** *Cf.* U.C.C. § 2–615 (excuse by commercial impracticality); *Roth Steel Products v. Sharon Steel,* 705 F.2d 134, 149–50 (6th Cir.1983) (excusing event under § 2–615 must be beyond reasonable control of party).

**16.** Although the concept originated in Civil Law, it became a principle of Anglo-American law about one hundred and fifty years ago. *See* Squillante and Congalton, *supra* at 5.

ed by a judicious yielding or by an abject surrender to demands. No contractor is excused under such an express provision unless he shows affirmatively that his failure to perform was proximately caused by a contingency within its terms; that, in spite of skill, diligence and good faith on his part, performance became impossible or unreasonably expensive."

*Id.* at 20–21. *See also Butler v. Nepple,* 54 Cal.2d 589, 6 Cal.Rptr. 767, 772–73, 354 P.2d 239, 244–45 (1960) (affirming *Oosten* rule that party must take reasonable steps to ensure performance).

**17.** In *Oosten,* the buyer refused to accept the seller's milk, because the buyer's employees threatened to go on strike if they had to handle the milk. Thus, the force majeure event never actually came about. The court held that the buyer could not assume that the strike would occur. He had not proved that performance was rendered impossible. 291 P.2d at 21.

**18.** Incidentally, we do not think that the *Oosten* rule is inapplicable to this case merely because the clause in Contract 1038 excuses "non-performance ... caused by" the excusing events rather than saying that the events made performance "impossible." *See Oosten, supra,* 291 P.2d at 19. In *Butler v. Nepple, supra,* the Supreme Court applied the *Oosten* rule to a case in which the force majeure clause excused the party who was "prevented from complying" by specified events. 354 P.2d at 244.

**19.** Even apart from the California Supreme Court's interpretation of force majeure clauses, it is probable that U.C.C. § 2–615 would require application of the "reasonable control" exception to each specified event in § XV of Contract 1038. Section 2–615, codified in California at Cal.Com.Code § 2615, provides certain limitations on the breadth of exculpatory clauses. Comment 8 provides:

Generally, express agreements as to exemptions designed to enlarge upon or supplant the provisions of this section are to be read in light of mercantile sense and reason, for this section itself sets up the commercial standard for normal and reasonable interpretation and provides a minimum beyond which agreements may not go.

The exemption envisioned by Occidental would certainly be broader than that provided in § 2–615. Although the statute does not contain an express "reasonable control" provision, virtually every court and commentator has read in such a limitation. *See, e.g., Eastern Air Lines, supra; Roth Steel Products v. Sharon Steel,* 705 F.2d 134, 149–50 (6th Cir.1983); Hawkland, *The Energy Crisis and Section 2–615 of the Uniform Commercial Code,* 79 Com.L.J. 75, 79 (seller

To be sure, the facts in *Oosten* are distinguishable from our case.[17] Nevertheless, the words of the California Court provide the most definitive statement of California law concerning the relationship between contractual force majeure clauses and the reasonable control limitation. The Court, in effect, requires proof that a party relying on a force majeure clause did not exercise reasonable control over the excusing event.[18] California law supports Judge O'Conor's decision to apply the control limitation to each of the specified events in the force majeure clause of Contract 1038.[19]

must have made reasonable efforts to perform). Moreover, Comment 10 to § 2–615 applies the equivalent of a reasonable control limitation in the context of interference by a government (notably one of the very excusing events relied upon by Occidental):

[G]overnmental interference cannot excuse unless it truly "supervenes" in such a manner as to be beyond the seller's assumption of risk. And any action by the party claiming excuse which causes or colludes in inducing the governmental action preventing his performance would be in breach of good faith and would destroy his exemption.

There is some dispute about whether § 2–615 provides specific boundaries to the breadth of force majeure clauses. *Compare Eastern Air Lines, supra* at 990 (only limit is "mercantile sense and reason") with Hawkland, *supra* at 79 (there are specific limits). In either event, the absence of a reasonable control provision would probably offend the Code. Professor Hawkland suggests that Comment 8 refers to two common law limitations, the second being that the occurrence of the

excusing contingencies must have prevented or delayed the seller's performance in spite of his reasonable efforts to perform. These are the *commercial standards* reflecting mercantile sense and reason that have been established over the years, and these are the *minimum beyond which* American courts have not permitted the parties to contract.

*Id.* As we have seen, the absence of a "reasonable control" limitation in our case would permit Occidental to rely on the force majeure clause without making reasonable efforts to ensure performance. Thus, if we adopted Prof. Hawkland's standard, Comment 8 would probably require that the "reasonable control" phrase or its equivalent limit each of the excusing events in Section XV.

Even if we adopted the looser standard (mercantile sense and reason) enunciated by this Circuit in *Eastern Air Lines,* a reasonable control limitation would probably be necessary. It

Finally, we note that the Northern District of Illinois reached the same result in construing a force majeure clause under Michigan law. *See Chemetron v. McLouth Steel*, 381 F.Supp. 245, 256 (N.D.Ill.1974), *aff'd*, 522 F.2d 469 (7th Cir.1975). The clause at issue in that case provided:

The failure of either Seller or Buyer to perform any of its obligations hereunder, if caused by an ... explosion ... or by any other circumstances beyond the reasonable control of the party so failing, shall not subject such party to any liability to the other party....

*Id.* The seller McLouth attempted to excuse its nonperformance because of explosions in its compressor. The District Court rejected the defense, in part because "there was not an adequate showing that the explosions were beyond McLouth's control." *Id.* The court was clearly applying the "reasonable control" requirement to the specified event (explosions).

In sum, we conclude that Judge O'Conor was correct in requiring Occidental to prove that pipeline breakdowns or the acts of the Libyan Government were beyond its reasonable control.

*Instruction on Legal Rights*

■ Our reading of *Oosten, supra,* and *Butler, supra,* also convinces us that Occidental's second assignment of error concerning force majeure is incorrect. Occidental argues that even if the trial court was permitted to instruct on reasonable control, it should have given an additional clarifying instruction.

In its proposed instructions to the jury, Occidental requested the judge to charge

that parties may, in good faith, do or refrain from doing that which they have a lawful right to do even though they may anticipate that a foreign government may take some action in retaliation. If a party does or refrains from doing

that which he has a lawful right to do, in good faith, it cannot be said that his action has caused or colluded in inducing governmental action, even though it may be anticipated that the government involved will take some step in retaliation.

Record at 258.

The instruction does not mention "reasonable control," because it was originally requested in the context of a separate defense pursuant to U.C.C. § 2–615.[20] The statute would excuse Occidental's breach if performance had become "commercially impractical," quite apart from whether Occidental came within the protection of the contractual force majeure clause. The case, however, went to the jury not on the U.C.C. defense, but only on the defense created by the contract clause.[21] Therefore, the court did not give the requested charge concerning the meaning of U.C.C. requirements.

After the judge had instructed the jury, however, Occidental did object

with regard to the court's instructions to force majeure on the grounds that the court has not instructed the jury that a party is entitled to invoke its legal rights without losing its protection of a force majeure provision.

Trial Transcript at 1327.

Initially, there is some question whether this objection adequately informed the trial court of the nature of the instruction desired by Occidental. *See Kroger v. Roadrunner Transportation*, 634 F.2d 228, 229–30 (5th Cir. Unit B, 1981); *Wallace v. Ener*, 521 F.2d 215, 218–19 (5th Cir.1975); *Delancey v. Motichek Towing Service*, 427 F.2d 897, 900 (5th Cir.1970); Fed.R.Civ. Proc. 51 (objection to instruction must clearly inform trial court of party's position).

---

is hard to imagine that any rational buyer would permit his seller to excuse performance because of an event over which the seller had control. As a matter of law, mercantile sense and reason would probably require that each excusing event be beyond the reasonable control of Occidental.

**20.** The words "caused or colluded in inducing governmental action" derive from Comment 10 to § 2–615.

**21.** Occidental has not raised as error the trial court's failure to instruct the jury on the U.C.C. defense.

Assuming, however, that the issue was properly preserved for appeal, the requested instruction did not accurately reflect the law in California. The instruction would permit Occidental to rest on its legal rights and to refuse any demands by the Libyan Government that violated the contract between Libya and Occidental. When Libya imposed restrictions on Occidental's oil production in 1975, Occidental, acting on the advice of counsel, withheld $117 million in payments that were due. The Government retaliated by imposing an embargo. Under Occidental's proposed instruction, the embargo would not have been within Occidental's reasonable control even if Occidental knew in advance that it could prevent the embargo by paying the $117 million.

As we have seen, however, California law requires Occidental to take extra steps to prevent the embargo unless "extreme and unreasonable difficulty, expense, injury, or loss[es] are involved." *Butler v. Nepple, supra,* 354 P.2d at 245; *Oosten, supra,* 291 P.2d at 20. Whether a third party violates a contract in demanding extra money from Occidental is certainly a factor in determining whether that expense is unreasonable. It is not dispositive, however. For example, if the Libyan Government had demanded that Occidental pay five extra dollars, the expense (though unlawful) would not be unreasonable in terms of Occidental's good faith obligation to perform its contract with Nissho. Therefore, Occidental's requested instruction was not accurate.

Nor was the trial court required to decide the issue of reasonable control as a matter of law. The issue is a classic jury question. Though we may disagree with the jury's result, we cannot reverse if there is substantial evidence to support the judgment. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969). If reasonable men could find that Occidental was able to prevent the embargo without incurring unreasonable expense, then we must affirm. *See id.* A review of the record in this case reveals that there was sufficient evidence to support such a verdict.

It is clear Occidental was aware of the threatened embargo and could have pre-vented it by paying $117 million. This sum in self was not unreasonable, since the entire figure represented back taxes, royalties, and oil costs that Occidental already owed the Libyan Government. Of course, even if Occidental had paid this sum and averted the embargo, it would still have faced production restrictions. A reasonable jury could have found, though, that Occidental would be able to recoup through arbitration or settlement any losses that might result from the restrictions. The company had already commenced arbitration proceedings against the Libyan Government; and, in December, it was able to reach a settlement. To be sure, the withheld payments and the resulting embargo were factors producing that settlement. That is not to say, however, that a settlement would not have been reached in the absence of an embargo. In the past, Occidental had been able to convince the Government to back down from production restrictions. A reasonable jury might have found that Occidental would again have been able to negotiate a reasonable settlement, particularly given the threat of the arbitration proceedings.

■ Similarly, there was sufficient evidence to support the view that Occidental had reasonable control over pipeline breakdowns. During 1975 and 1976, Occidental conducted numerous repairs on the pipeline leading from Concession 102 to Zueitina. In October, 1975, Occidental began repairs and disconnected a section of the line. The line remained severed until after the embargo ended in December. There was testimony that Occidental left the line disconnected because it did not want to spend money for repairs until after it had settled its dispute with Libya. Trial Transcript at 581. When the line was reconnected, Occidental discovered that it was clogged with sand. A reasonable jury could have found that the blockage of the line or the failure to discover the blockage earlier was caused by Occidental's delay in repairing and reconnecting the line. The evidence supported a finding that the pipeline breakdown was within Occidental's reasonable control.

In sum, there was no reversible error in either the force majeure charge given by Judge O'Conor or the jury's result.

## WAIVER

██ Occidental also challenges the jury's finding that Occidental was liable to Nissho for breach of contract but was not entitled to any offset for damages resulting from Nissho's underliftings. *See* Record at 232, 233. Nissho violated Contract 1038 by failing to lift oil during several months in 1974 and 1975.[22] Occidental argues, then, that the only possible explanation for the jury's verdict is a unilateral waiver. The jury must have found that Occidental waived the underliftings, but that Nissho did not in turn waive Occidental's breaches in late 1975 and early 1976.

This finding, according to Occidental, is contrary to the evidence at trial. The evidence of waiver is a letter dated May 27, 1976, in which Nissho agreed to a future suspension of Contract 1038 on the understanding that all lifting requirements for 1974, 1975 and 1976 would be waived. Plaintiff's Exhibit 161, at 1. Occidental claims that the letter clearly contemplated a waiver of both parties' obligations. Furthermore, the appellant contends that the finding of unilateral waiver was contrary to Judge O'Conor's jury instructions.

We disagree with both arguments. Taking them in reverse order: first, the jury instructions did not preclude a finding of unilateral waiver. Judge O'Conor charged:

> Occidental also claims that it is not liable for its failure to deliver Zueitina Medium crude oil under Contract 1038 because Nissho waived some or all of the requirements of the Contract. Occidental asserts that the parties agreed to waive the requirement that either party perform under the Contract for 1974,

1975, and 1976, and to place the Contract in a state of suspension until March, 1977.

> You are instructed that parties to a contract may agree to waive performance requirements and may agree to suspend the contract, in which case neither party has the obligation to perform. A waiver is the intentional relinquishment of a known right after knowledge of all the relevant facts. Occidental has the burden of proof on the issue of waiver. In order to find that Occidental is not liable for breach of contract, you must find that Nissho intended to give up its rights under the Contract and that such a decision was made after Nissho knew all of the relevant facts. If you conclude that Nissho agreed to give up or waive rights without knowing all the relevant facts, that waiver would not be binding on Nissho, but neither could Nissho claim any benefits that it might have gained through that waiver.

Record at 212.

Occidental takes the position that the court required mutual waiver by instructing "that parties to a contract may agree to waive performance requirements and may agree to suspend the contract, in which case neither party has the obligation to perform." The sentence appears to excuse both parties from performance where they have *both agreed* to waiver. It does not, however, prevent a unilateral waiver. On the contrary, a separate instruction by Judge O'Conor plainly permitted a unilateral waiver. The judge instructed that Nissho could recover on its contract when Occidental had waived Nissho's performance:

> In order to prevail on the breach of contract theory, ... Nissho must establish ... that Nissho had substantially

---

22. Nissho argues that it substantially complied with the contract. The underliftings in early 1974 and 1975 were the fault of Occidental in failing to produce sufficient oil. The underliftings in late 1974 were the fault of Nereus in failing to nominate ships at the proper time. The latter excuse, however, normally would not relieve Nissho, because it had hired Nereus to pick up the oil. Any failure by Nereus to perform must be attributed to Nissho.

It is conceivable that the Force Majeure clause might have protected Nissho in this situation, since the clause excuses nonperformance caused by "loss or shortage of transportation facilities." *See* Plaintiff's Exhibit 88, at 4. Nissho has not made that argument on appeal, however.

Thus, Nissho has given no valid excuse for the underliftings in late 1974.

performed under Contract 1038 at the time of Occidental's failure to deliver crude oil.... Nissho can establish substantial performance by proving any *one* of the following:

> (c) that Occidental had waived any failure of Nissho to comply with the terms of the Contract.

Record, at 208. This instruction would be meaningless if bilateral waiver were required. Nissho could not prove that Occidental had waived its performance, unless Nissho had simultaneously waived Occidental's performance. If that were true, however, Nissho could not "prevail on the breach of contract theory." The jury instructions must be read as a whole. We hold that the instruction on substantial performance clearly allowed the jury to find a unilateral waiver. The later instruction, quoted by Occidental, merely excused both parties from performance when they had both agreed to be excused.

■ For the same reason, Judge O'Conor did not proscribe a unilateral waiver when he charged

> If you conclude that Nissho agreed to give up or waive rights without knowing all the relevant facts, that waiver would not be binding on Nissho, but neither could Nissho claim any benefits that it might have gained through that waiver.

Record at 212. Again, the instruction refers only to the situation in which both parties mutually agree to waive performance. Nissho could not simultaneously deny such an agreement and claim benefits under the agreement. The instruction does not prevent Nissho from recovering under the contract when Occidental has unilaterally waived its performance.

Indeed, if the judge had required mutual waiver, he would have misstated the law. California clearly permits a unilateral waiver of defects in performance. *See, e.g.*, 1 *Witkin, Summary of California Law* (8th Ed.), Contracts §§ 593 *et seq.;* 14 Cal. Jur.3d §§ 264–65.

■ Finally, there was sufficient evidence to support a jury finding that Occidental unilaterally waived Nissho's underliftings. David B. Orser, an Executive Vice-President of Occidental at the time of Nissho's underliftings, testified that Occidental originally considered legal action but decided to seek a commercial solution instead. The company did not want to lose Nissho as a customer, because Occidental had been a pioneer developing the Japanese market for Libyan oil, and Nissho was its first Japanese customer. Record at 1101–02.[23]

Moreover, the May 27, 1976, letter from Nissho to Occidental referred to and reconfirmed an earlier agreement to waive Nissho's underliftings:

> We assume from your proposal that any lifting requirements applicable to the continuation of Contract 1038 will be *waived* for all of calendar year 1976 as well as through the period that such contract is suspended *in the same manner as lifting requirements were dealt with for calendar years 1974 and 1975. We reconfirm our agreement that any lifting requirements for calendar years 1974 and 1975 have been fulfilled and satisfied.*

---

**23.** The transcript of Mr. Orser's testimony reads as follows:

> Q  Did Occidental ever consider taking any action against Nissho because of the underliftings?
> A  Yes, we did.
> Q  What decision did you reach with regard to whether or not you would take action against Nissho because of the underliftings?
> A  Well, the first thing I did was I asked our legal department to apprise me of our alternatives. We then had an in-house meeting, and we concluded that our best course of action was to let Mr. Niwa seek a commer-

cial solution to this underlifting and not to take legal action.

> Q  What were the factors behind the decision not to take legal action, but to seek some commercial solution?
> A  Well, I guess the main thing was that Nissho was our first Japanese customer. We had been a pioneer in developing the market for Libyan oil in Japan, and we did not want to loose [sic] Nissho as our customer. And we did not want to abandon the Japanese market.

*Id.*

Plaintiff's Exhibit 161, at 1. The jury was not required to find that this language waived the performance of both parties for the years 1974, 1975, and early 1976. The letter refers only to "lifting requirements," (i.e. Nissho's òbligation to lift oil) during that period. It says nothing about supply requirements.[24] Nor did Occidental's original proposal to suspend future performance mention a waiver of any past requirements. *See* Letter dated May 12, 1976, Plaintiff's Exhibit 86, at 2. The agreement in the two letters to suspend the performance of both parties from October 1, 1976, through March 31, 1977, had no effect on their obligations *before* May 27, 1976. *See id.;* Plaintiff's Exhibit 161, at 1.

In sum, the jury could have found that there was a unilateral waiver of Nissho's underliftings and that the May 27 letter did not establish a mutual waiver. The failure to award Occidental an offset was compatible with the evidence and the charge.

### DAMAGES

■ Occidental raises a number of challenges to the amount of damages the jury awarded Nissho. Because we find that one of the claims has merit and requires a complete retrial of damages, we need not consider the other arguments in detail.

### *Suspension of the Contract*

As we have pointed out in several parts of this opinion, Nissho agreed on May 27, 1976, to suspend the performance of both parties from October 1, 1976 through March 31, 1977. *See* Plaintiff's Exhibit 161. Occidental was not required to supply oil during that period; and Nissho was not required to lift any barrels. Performance was halted completely for six months.

Nevertheless, when Nissho introduced evidence of the profits that it lost as a result of Occidental's nonperformance, it included profits from oil that would have been sold during that period. Nissho's primary witness on lost profits was Yoshiomi Matsumoto, the Deputy General Manager of Nissho's Fuel Department. Mr. Matsumoto introduced two charts that he had prepared, showing net commissions Nissho would have earned on oil sales to Kansai between the fourth quarter of 1975 and the fourth quarter of 1978, Plaintiff's Exhibit 180, as well as interest income that Nissho would have received, Plaintiff's Exhibit 177. $243,425 of the lost commissions came from sales that would have occurred during the suspension period. Likewise, $313,997.40 of lost interest (calculated on a 30-day float) derived from money that would have been held by Nissho because of sales occurring during the suspension period. Nissho argues that a 40-day float is more appropriate,[25] so when we adjust the interest figure, we find that $418,663.20 of interest is attributable to sales that would have been made while the contract was suspended. The sum of lost profits during the suspension period, according to the evi-

---

**24.** Occidental directs our attention to the deposition of Kouji Fujino, a former Deputy General Manager of Nissho's Fuel Department. In the deposition, Mr. Fujino testified that the letter waived all performance requirements for both parties for the years 1974, 1975, and 1976. *See* Trial Transcript at 1054. At trial, however, Mr. Fujino took the position that only Nissho's requirements were waived. He stated that his deposition testimony was wrong: "It is because I didn't write the letter. I didn't understand what is meant. But I took a chance that was what it means." *Id.* The jury was entitled to believe his trial testimony over his deposition testimony.

**25.** There was some confusion at trial about the actual length of the float period for each sale. The period for each shipment began on the day Nissho was first paid by Kansai and ended on the day Nissho had to repay Occidental. The interest Nissho earned during that period constituted the largest portion of its profits.

Mr. Matsumoto based his interest chart, Plaintiff's Exhibit 177, on a 30-day float period. The evidence at trial indicated, however, that the period should have been at least 40 days long. Mr. Matsumoto himself testified that thirty days was too short. Trial Transcript at 834.

Nissho argues, therefore, that we should adjust the 30-day figures, multiplying them by $^{40}/_{30}$ to reach the proper 40-day figures. See Appellee's Brief at 38 n. 26. Such an adjustment might not be perfectly accurate, because the compounding of interest during the 10 new days might produce some extra profit. The difference would be slight, however, and Nissho's equation provides an adequate approximation of a 40-day float.

dence presented by Nissho, was $243,425 plus 418,663.20, for a total of $662,088.20.

The question, then, is whether the jury could award damages for profits that would have been incurred during the period that performance was suspended. Nissho argues that such damages were proper, because Kansai had already decided not to renew its contract with Nissho in May, 1977 when Occidental and Nissho agreed to suspend the contract. The profits were, in effect, already lost.

Neither side cites any authority discussing the effect on lost profits of a mutual, negotiated suspension. Nor have we been able to find any cases on point. Therefore, we face the issue as one of first impression. We hold that Nissho was not entitled to any profits that would have been earned during the period of suspension. The agreement between Occidental and Nissho clearly released Occidental from any obligation to supply oil to Nissho between October, 1976 and March, 1977. The suspension of the contract also benefitted Nissho, since its lifting requirements were held in abeyance. The clear and predictable consequence, however, of Nissho's agreement to the suspension was that the company would have no oil to sell to Kansai or any other buyer. It is inconsistent for Nissho now to seek the profits that it might have made on sales it essentially agreed to forego. The parties put the entire contract in suspension during those six months; likewise any right to profits during the period was suspended.

If Occidental's failure to supply oil in late 1975 and early 1976 was an entire breach of the contract, as Nissho contends, then Nissho had the option of terminating the contract at that time and collecting damages. *See Rischard v. Miller*, 182 Cal. 351, 188 P. 50 (1920); *Associated Lathing v. Dunn*, 135 Cal.App.2d 40, 286 P.2d 825 (1955); 1 *Witkin, Summary of California Law, supra*, Contracts, § 620 at 528. Since it elected not to terminate, it had a continuing obligation to perform as well as to minimize damages, *see Johnson v. Comptoir*, 135 Cal.App.2d 683, 288 P.2d

151 (1955). When Nissho suspended its obligation to perform and denuded itself of the power to mitigate, it also gave up the right to recover profits during the suspension period.

Aside from the pure inconsistency of awarding such damages, the rule requiring clear proof of injury militates against the award. In this case, the decision to suspend the contract made it highly speculative whether Occidental's breach actually caused the loss of the profits during that period. Nissho was able to make two spot sales to Kansai during the summer of 1976. It might have made other sales the following winter, but the suspension ended that possibility. California law requires a plaintiff to prove with reasonable certainty that its loss of profits was actually caused by the defendant's breach. *See Continental Car-Na-Var Corporation v. Moseley*, 24 Cal.2d 104, 113, 148 P.2d 9, 14; *Drouet v. Moulton*, 245 Cal.App. 667, 54 Cal.Rptr. 278, 281 (1966). We can only speculate whether each of Nissho's losses during the suspension period was caused by Occidental's breach or by the decision to suspend performance.

In sum, the verdict is improper to the extent that it includes lost profits between October 1, 1976 and March 31, 1977. Remittitur would be inappropriate, however, because we cannot tell how much damage the jury awarded for the suspension period. The general award of $7,025,-000 contract damages did not identify the specific components that went into the sum. *See* 11 *Wright & Miller, Federal Practice and Procedure* § 2815, at 99 (1973). More important, the award exceeded Nissho's own proof, by a substantial margin; thus, we cannot assume that the jury awarded the precise amounts proved at trial. The two main elements of damage were the cost of the Nereus settlement and lost profits. Nissho settled its dispute with Nereus for $2,225,000 and expended $43,-000 in attorney fees. Subtracting those two figures from the general award leave $4,757,000 [26] attributable only to lost prof-

**26.** 7,025,000 − 2,225,000 = 4,800,000.

4,800,000 − 43,000 = 4,757,000.

its. Mr. Matsumoto's charts and testimony, however, specifically proved $4,016,855 in profits lost during all periods including the suspension period.[27] The jury must have decided that the lost profits were actually higher than Mr. Matsumoto's estimates; but we cannot tell how much of the award represents profits that would have been earned during the suspension period.[28]

Therefore, we must remand for a complete retrial of contract damages. *See Gasoline Products v. Champlin Refinery,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); 11 *Wright & Miller, Federal Practice and Procedure,* §§ 2814, 2815, at 91–

99 (1973). The trial court on remand will operate from the premise that Occidental breached Contract 1038 by failing to provide oil during late 1975 and early 1976. It is liable to Nissho for damages. Nissho, on the other hand, is not liable for offsetting damages; Occidental waived any nonperformance by Nissho. The re-trial will be solely to determine the proper measurement of damages.[29]

We will not require the trial judge to use special interrogatories, forcing the jury to specify the damages that it awards for each type of injury and the period during which it occurred. On the other hand, we

---

**27.** The charts showed $1,769,950 in lost commissions and $2,435,178.85 in interest (calculated on a 30-day float). Adjusting the latter figure for an approximate 40-day float according to Nissho's equation, *see supra* note 25, we derive $3,246,905.13 in lost interest. Thus, the sum of lost commissions and interest on a 40-day float yields a grand total of $5,016,855.13.

Mr. Matsumoto also testified, however, to two spot sales in 1976 that earned Nissho "about one million dollars" in profit, mitigating its losses. The precise figure is somewhat unclear; one document indicates that Nissho earned $1,140,-557 in spot sales over a period from December, 1975 to December, 1978. *See* Plaintiff's Exhibit 255. There is no evidence, though, that the sales yielded less than $1,000,000; and Nissho does not dispute that figure. Nissho *does* argue on appeal that Occidental failed to prove that the spot sales were actually in mitigation. Yet Nissho's attorney himself conceded at trial that they were mitigation sales. He led Mr. Matsumoto to subtract the $1,000,000 from his other calculations "for the sake of fairness." Trial Transcript at 838. This dialogue plainly indicated that the figure represented profits earned in mitigation of the other losses.

When we reduce the profits by $1,000,000, we obtain $4,016,855.13 as the total of legally compensable profits proved by Mr. Matsumoto at trial. This sum includes profits that would have been earned during the suspension period.

Our discussion is based on the following calculations:

| | |
|---|---|
| Lost Commissions | 1,769,950.00 |
| Lost Interest | |

30-day float – 2,435,178.85

$$X \frac{40}{30}$$

approx. 40-day float – 3,246,905.13

| | | |
|---|---|---|
| | + | 3,246,905.13 |
| Total Lost Profits | | 5,016,855.13 |
| Mitigation Sales | – | 1,000,000.00 |
| Compensable Lost Profits | | 4,016,855.13 |

**28.** Mr. Matsumoto testified that his calculations of lost profits and interest were minimum estimates. *See* Trial Transcript at 829, 836. He did not, however, explain which of the particular figures might be higher or by how much. In addition, we cannot assume that the jury took each of his estimates and multiplied it by a constant. The jury might well have awarded lost profits only for certain months.

**29.** At re-trial, Nissho may attempt to prove that the contract was not in fact suspended between October 1, 1976, and March 31, 1977. The record before us only supports a finding that there was a suspension; but it is conceivable that there is some evidence not previously introduced that disproves the suspension. On the other hand, if Occidental again proves that there was a suspension, then the court may not assess damages for that period, as we have explained in the text.

Occidental likewise may attempt to prove on remand that Nissho terminated Contract 1038 in early 1977 pursuant to Sections 10.1–10.3 of the contract. The sections provide that if the Libyan Government increases royalties or taxes, Occidental may pass those costs on to Nissho. Nissho, however, has the option to reject the price increase and terminate the contract. *See* Plaintiff's Exhibit 88, at 3, §§ 10.1–10.3. If Nissho did terminate the contract in this manner, then it may not collect lost profits from crude oil that it would have received under Contract 1038 after the termination date. Our reasoning in this regard is analogous to the reasoning concerning suspension period profits. The termination is not based on any breach by Occidental but rather follows a contractual procedure concerning rising costs. In effect, because neither party is willing to absorb the extra costs, they agree to call off the contract. Nissho cannot recover for profits on oil it would have received after that date.

do think that the use of such interrogatories could avoid some of the problems that have arisen on this appeal.[30]

### Indirect and Consequential Damages Clause

Section IX of Contract 1038 comes under the heading "Berth, Loading and Demurrage." Plaintiff's Exhibit 88, at 3. Subsections 9.2(a)–(f) contain various provisions describing the demurrage charges that Occidental was obligated to pay if Nissho's vessels were delayed at port. Subsection 9.2(g) provides: "No claim shall be made by [Nissho] under any circumstances for indirect and consequential damages except as may otherwise be provided herein." *Id.*

Occidental never raised this clause at trial. Nor did C.F. de Lanoy Meijer, the Occidental in-house counsel who drafted Contract 1038, mention subsection 9.2(g) when he testified at trial. Nevertheless, Occidental now argues on appeal that the provision applies not only to demurrage but to any indirect or consequential damages resulting from nonperformance of the contract. According to Occidental, the clause prevents Nissho from recovering the payments it made to Nereus in settlement of the charter agreement as well as the loss of profits under the Kansai contract.

We may consider an issue raised for the first time on appeal only if it involves a pure legal question and our failure to consider it would result in a miscarriage of justice. *See United States v. Community Science Technology*, 574 F.2d 1292 (5th Cir.1978); *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 768 n. 10 (5th Cir.1976). It is not clear that the proper interpretation of subsection 9.2(g) would have involved a pure question of law had it been raised properly at trial. Although the contract provides that section headings are not dispositive, *see* Section 20.1, Plaintiff's Exhibit 88, at 4, the placement of the indirect damage clause in the midst of demurrage provisions creates at least some ambiguity about whether the clause should apply to other sections of the contract. If the issue had been raised at trial, it is possible that Nissho would have adduced evidence of the intent of the parties in drafting the contract. Since there might have been issues of fact, we decline to interpret the clause now. *See Higginbotham v. Ford Motor Co., supra.* Our holding does not, however, preclude Occidental from raising the clause during the re-trial on damages.

### Reasonableness of Nereus Settlement

Occidental also asserts error in Judge O'Conor's failure to give an instruction on the reasonableness of the Nereus settlement. Occidental had requested the judge to instruct the jury to consider whether the amount of the settlement was reasonable. We hold that Judge O'Conor did not err in refusing the instruction. Occidental had not put the reasonableness of the amount in issue; on the contrary, Occidental had conceded that Nissho "got a good deal under this cancellation [of the Nereus contract]." Trial Transcript at 1257. Again, however, our holding does not preclude Occidental from challenging the reasonableness of the settlement on remand.

### FRAUD AS A SEPARATE CAUSE OF ACTION

When Occidental was unable to supply oil in 1975 and early 1976, it made a number of misrepresentations to Nissho. For example, Occidental stated that it was unable to supply Zueitina Medium in September, 1975, because of production restrictions. That statement was untrue.[31] Occidental also allegedly gave false assurances as to when oil would again be available.

Because of these misrepresentations, Nissho pleaded a separate count for fraud in this litigation. The jury found that Occi-

---

**30.** For example, special interrogatories could distinguish between damages awarded for the Nereus settlement, the lost Kansai profits, and other injuries. Moreover, such interrogatories could require the jury to specify the amount of lost Kansai profits it assigns to each relevant period of time.

**31.** *See supra* note 4.

dental was liable for fraud and awarded Nissho $70,250 compensatory damages and $210,750 punitive damages in addition to the $7,025,000 awarded for breach of contract. *See* Record at 232.

Occidental argues that a false representation made in the performance of a contract by one of the parties to the other will not support an action for fraud. California law does not permit a plaintiff to recover punitive damages for breach of contract. *See Crogan v. Metz,* 47 Cal.2d 398, 404–405, 303 P.2d 1029, 1033 (1956); California Civil Code § 3294. Even if the breach is fraudulent or malicious, a court may not award punitive damages. *Baumgarten v. Alliance Assurance,* 159 F. 275, 278 (N.D. Cal.1908); *Weatherbee v. United Insurance Co. of America,* Cal.App., 71 Cal. Rptr. 764, 768 (1968). Occidental claims that Nissho is using the fraud action to recover punitive damages for an injury deriving essentially from breach of Contract 1038.

Nissho responds that a suit for punitive damages is proper if the performance of the contract also involves a separate tort. *See Jones v. Kelly,* 208 Cal. 251, 280 P. 942 (1929); 4 *Witkin, Summary of California Law,* Chap. X, at 2305 (1974). Nissho has cited no case, however, in which misrepresentations in the performance of a contract permitted a plaintiff to recover for fraud as well as breach of contract. Our own research has only turned up cases involving fraud in the inducement or inception of a contract rather than fraud in the performance. *See, e.g., Schroeder v. Auto Driveaway,* 11 Cal.3d 908, 922, 114 Cal. Rptr. 622, 523 P.2d 662 (1974); *Horn v. Guaranty Chevrolet Motors,* 270 Cal. App.2d 477, 75 Cal.Rptr. 871 (1969). In those cases, the plaintiffs entered into a contract in reliance upon untrue representations. Fraud is a proper cause of action for remedying subsequent injuries; and punitive damages may be awarded. By contrast, when the parties deal honestly in creating a contract, any damages resulting from the breach cannot be augmented by punitive damages. *Crogan v. Metz, supra;* Cal.Civil Code § 3294.

The actions of a party in breaching a contract could lead to a tangential fraud. For example, if a seller, while failing to perform one sales contract, fraudulently induced the buyer to enter into another transaction, then the buyer could bring an action for fraud on the second agreement. However, each of the elements of fraud must be shown. The plaintiff must prove that the defendant made a

> fraudulent representation ... as to a material fact which [was] false and known to be false by the maker, or [was] recklessly made or made without reasonable grounds for believing its truth. It must be made with intent to induce action by the other party and it must have been relied upon by the other party with justification. It must result in damage or injury to the party so relying. The absence of any one of these elements will preclude recovery.

*Gonsalves v. Hodgson,* 38 Cal.2d 91, 237 P.2d 656; 34 *Cal.Jur.3d,* Fraud and Deceit § 6, at 547–48. Moreover, the plaintiff must prove that his injuries actually resulted from the fraud and not from the breach of the first contract. The injuries must be entirely separate from those suffered because of breach. Otherwise, there is too great a danger that he is using injuries resulting from the breach as a basis for tacking on punitive damages.

In this case, Nissho asserts that it suffered injuries to its reputation, good will, and business relationship with Kansai. Yet it never showed that those harms were distinct from injuries caused by the breach of the contract. On the contrary, the testimony of Nissho's own witnesses proved that Occidental's failure to supply oil forced Kansai to terminate its contract with Nissho, thereby impairing their business relationship. *See, e.g.,* Testimony of Nobuo Ito, Trial Transcript at 600. Furthermore, Nissho's good will and business reputation were injured when other Japanese utilities discovered that it could not supply oil regularly and had lost the Kansai account as a result. As Kuoji Fujino responded to the questioning by counsel for Nissho:

Q Now, tell the jury why it is important for a trading company like Nissho to have a long-term contract of affreightment for a customer like Kansai Power Company.
A Well, to have business relationship with public utility, it is one of the reputation of the company.
Q It's one of the what?
A Reputation of the company.

. . . . .

Q Now, let me ask you some questions about what effect the cancellation of the contract, verbal contract Kansai had with Nissho. Number One, what effect did the cancellation of the contract by Kansai of Nissho that took place in March of 1976 have on your—on Nissho's relationship with Kansai?
A Kansai lost confidence in our business and, well, they sympathize with us in a sense, but they said Nissho does not bring to them that supply. And we want to cancel to you this occasion of doing business with Kansai. And other power companies, everybody know we have the contract. But other power companies came to know what happened.
Q Other power companies in Japan?
A Yes, sir. Then whatever we have done after that, they never give us opportunity to buy on a long-term basis.
Q They damaged your reputation?
A Yes, sir.
Q Both with Kansai and other power companies?

A Yes, sir.

Trial Transcript at 977, 985; *see also* Testimony of Nobuo Ito, *id.* at 612.

In sum, the evidence showed that the injuries resulting from fraud were not distinct from those caused by the breach of contract. We must reverse the fraud verdict. *See Gonsalves v. Hodgson, supra.* Nissho may still prove the injuries to its good will, reputation, and business relationship with Kansai as part of the contract damages on remand.[32]

## TAXATION OF COSTS

■ Judge O'Conor taxed Occidental for various costs incurred by Nissho during the two trials. The costs included witness fees of $14,180, copying costs of $3,264.64, and deposition costs of $4,841.18. A trial judge has discretion to award costs to a prevailing party, and "we will not overturn his decision unless a clear abuse thereof is shown." *Kinnear-Weed Corp. v. Humble Oil & Refining,* 441 F.2d 631, 637 (5th Cir.), *cert. denied,* 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 255 (1971). We find no abuse of discretion in this case.

### *Witness Fees*

Part of the witness costs were travel expenses for five witnesses who resided more than 100 miles from Houston.[33] This Circuit has held that a court may assess costs for journeys of more than 100 miles if there are special circumstances justifying

**32.** In Occidental's discussion of the fraud claim, it also argues that the jury was prejudiced by testimony concerning its "bribery" of the Libyan royal government. It is not clear whether Occidental believes that the testimony affected only the fraud verdict or the contract verdict as well. In either event, the testimony was not highly prejudicial and does not warrant a reversal.

Two witnesses referred to payments made by Occidental at the time it originally secured its oil concessions. Mr. George Schuler briefly mentioned that some payments were considered "irregular", Trial Transcript at 340; and Mr. de Lanoy Meijer denied Occidental had made any bribes, Trial Transcript at 672. When counsel for Nissho pressed Mr. Meijer, the trial court sustained an objection and forced the counsel to turn to other matters. The issue of irregular payments did not arise again at trial.

Thus, whether or not the testimony was relevant, it was not very prejudicial. Occidental did not show that "the conduct of counsel or witnesses [was] such as to impair gravely the calm and dispassionate consideration of the case by the jury." *Crown Colony Distributors v. U.S. Fire Insurance,* 510 F.2d 544, 545 (5th Cir.1975).

On the other hand, we expect that there will be no mention of the irregular payments on remand. The testimony is completely irrelevant to the assessment of damages; and it must not be brought before the jury again.

**33.** G. Henry Schuler lived in Washington, D.C., Robert Ian Hattrick in London, Yoshiomi Matsumoto in Tokyo, Takeshi Kido in Tokyo, and Kuoji Fujino in New York.

the presence of the witnesses at trial. *Goodwin Brothers Leasing v. Citizens Bank,* 587 F.2d 730 (5th Cir.1979); *see also Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 232, 85 S.Ct. 411, 415, 13 L.Ed.2d 248 (1964) (refuting strict 100-mile limit on travel expenses).

The relevance and necessity of the witnesses' testimony, *Kaiser Industries Corp. v. McLouth Steel Corp.,* 50 F.R.D. 5, 10 (E.D.Mich.1970); *Electronic Specialty Co. v. International Controls Corp.,* 47 F.R.D. 158, 161 (S.D.N.Y.1969), and the existence of court approval before the incurrence of travel expenses, *Farmer v. Arabian American Oil Co., supra,* are to be considered in determining whether special circumstances are present.

*Goodwin, supra,* 587 F.2d at 734. Judge O'Conor properly concluded that the necessity and relevance of the witnesses' testimony warranted their travel. As he stated in his memorandum order on costs:

In order to enable the jury to understand this complicated case, Plaintiff had to present fact witnesses with personal knowledge of the relevant events and consequently had to call witnesses who resided more than 100 miles from the courthouse. In addition, the singular qualifications of Mr. Schuler, Plaintiff's expert witness on Libyan affairs, justified the expense incurred in bringing him from Washington, D.C. to describe to the jury the situation that existed in the Middle East at the time of the events that formed the basis of this lawsuit.

*Memorandum and Order,* at 4–5.[34] There was no error in awarding the travel costs.

Furthermore, it was appropriate to award the costs for both trials. The Supreme Court has permitted costs to be awarded for two trials, even where a directed verdict for the defendant in the first trial was improper, and the defendant had to win its entire case again on remand. *See Farmer v. Arabian American Oil Co., supra,* 379 U.S. at 229, 233, 85 S.Ct. at 413, 415. Here, Nissho won a jury verdict in the first trial, but confusion in the verdict caused Judge O'Conor to declare a mistrial and order a new trial. Live witnesses were just as necessary in the second trial as in the first. Given the extreme complexity of facts and legal issues, Nissho could not rely on deposition testimony or transcripts from the first trial to make its case. Indeed, the trial court found that use of the testimony from the first trial would only have added confusion to the second proceeding. *See Memorandum and Order, supra,* at 2.[35]

In challenging the award of witness fees, Occidental also objects to fees and sustenance allowance that were assessed for days during which the five witnesses were present in Houston, but not testifying. Indeed, one of the five (Mr. Kido) never took the stand.

The fees were certainly permissible for the four witnesses who actually testified. Even when they were not on the witness stand, they were "in necessary attendance on the court, in readiness to testify." *Hurtado v. United States,* 410 U.S. 578, 584, 93 S.Ct. 1157, 1161, 35 L.Ed.2d 508 (1973). Moreover, we hold that Judge O'Conor did not abuse his discretion in awarding wit-

---

**34.** Mr. Hattrick is an English solicitor who represented Nissho in the Nercus arbitration. His testimony concerned the role of Nercus in shipping oil and the function of the contract of affreightment between Nercus and Nissho. He also testified about the breakdown of that agreement, Occidental's role in the ensuing arbitration, and the ultimate figure.

Mr. Matsumoto, as we have already seen, was the Deputy Manager of Nissho's Industrial Energy Section and the salesman in charge of the Kansai account. He described Kansai's decision to terminate its contract with Nissho.

Mr. Funino was the Deputy Manager of Nissho's Fuel Department. He conceived of the

method for shipping Libyan oil to Japan and explained the contract with Occidental.

Mr. Kido was the Manager of the Industrial Energy Section. He did not testify, but was available to refute the testimony of a potential witness for Occidental. *See infra* at 3404–3405.

**35.** We also note that the costs of transporting witnesses for the two trials were relatively moderate for so complicated a case. *Compare Farmer v. Arabian American.Oil Co., supra,* 379 U.S. at 230, 85 S.Ct. at 414 (District Judge Weinfeld had found that costs were "staggering" for so *un*complicated a case).

ness fees for Mr. Kido. Although courts do not ordinarily allow fees for witnesses who have not testified at trial, a court may award such a fee if the witness was ready to testify but extrinsic circumstances rendered his testimony unnecessary. *See Quy v. Air America,* 667 F.2d 1059, 1064–65 (D.C.Cir.1981); *United States v. Lynd,* 334 F.2d 13, 16 (5th Cir.1964); *Wehr v. Burroughs Corp.,* 477 F.Supp. 1012, 1022 (E.D. Pa.1979), *modified on other grounds,* 619 F.2d 276 (3d Cir.1980).

Mr. Kido was a Nissho employee who dealt directly with Sheago Niwa, the Vice President of Sales for Occidental. Mr. Niwa was present throughout trial, and Occidental intended to call him as a witness. Mr. Kido was prepared to refute Niwa's testimony if necessary. Occidental finally called Mr. Niwa to the stand on the last day of evidence, but the court immediately took a recess. After the recess, counsel for Occidental announced that it would present no further witnesses. As Judge O'Conor found: "Only Defendant's last minute decision not to have Mr. Niwa testify rendered Mr. Kido's testimony unnecessary." *Memorandum and Order, supra,* at 3.

Thus, Judge O'Conor did not err in awarding fees for the period when Mr. Kido was in readiness to testify. *See Hurtado v. United States, supra.* Nor should those fees be limited to the period following the plaintiff's case. It was not absolutely certain before trial how long the plaintiff's case would last; and Judge O'Conor found that Mr. Kido was in attendance throughout the trial.

*Enlarged Photocopies*

■ Judge O'Conor taxed the costs of photocopies, including "blow-ups" of documents. We hold that this was not error. 28 U.S.C. § 1920(4) authorizes courts to tax "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." This Circuit has held that the costs of copying exhibits and documents come within section 1920(4). *See Scroggins v. Air Cargo,* 534 F.2d 1124, 1133 (5th Cir.

1976). The issue that we face is whether a court may tax the cost of *enlarged* copies.

In this case, the parties had agreed to the use of enlarged copies.

At the first trial, Defendant had certain documents enlarged for use in the presentation of its case. In response, Plaintiff had certain other documents enlarged for its use at the second trial. By agreement of the parties, the blow-ups were admitted into evidence and sent to the jury room at the second trial. *Memorandum and Order, supra,* at 7. We hold that where the parties agree to try a case on enlarged copies, the enlargements should be treated like any other copies for the purpose of taxing costs.[36]

*Depositions*

■ The final category of costs challenged on this appeal includes the expense of thirteen depositions. The trial judge has great discretion to tax the cost of a deposition if he finds that "all or any part [of the deposition] was 'necessarily obtained for use in the case.'" *Carpa, Inc. v. Ward Foods,* 567 F.2d 1316, 1323 (5th Cir.1978), *overruled on other grounds, Copper Liquor v. Adolph Coors Co.,* 701 F.2d 542, 543 (5th Cir.1983); *United States v. Kolesar,* 313 F.2d 835, 840 (5th Cir.1963). Judge O'Conor determined that each of the depositions, whether actually admitted at trial or not, was necessarily obtained for use in this case. Even the depositions of witnesses testifying for Nissho were used by counsel to structure their questioning of the witnesses. *See Memorandum and Order, supra,* at 6. We hold that the use of a deposition to structure questioning comes within the *Kolesar* rule. Judge O'Conor did not abuse his discretion in taxing these costs.

SUMMARY

Although the legal issues are myriad and difficult in this case, our end result can be stated in a few lines. We affirm the judgment that Occidental breached its contract with Nissho; but we remand for a limited

---

**36.** We do not decide whether the costs of enlarging copies may always be taxed.

retrial of contract damages. We reverse the fraud judgment and the award of punitive damages; but Nissho may prove on remand that it suffered injuries to its good will, reputation, and business relationships as a result of the contract breach. Occidental, in turn, may offer evidence concerning the reasonableness of the Nereus settlement and the effect of the contractual limitation on indirect and consequential damages. Occidental may also prove that the parties agreed to suspend the contract or to terminate pursuant to sections 10.1 and 10.3.[37]

Finally, we affirm the assessment of costs.

The case is remanded for further proceedings in accordance with this opinion.

AFFIRMED IN PART.

REVERSED IN PART.

REVERSED AND REMANDED IN PART.